## COURT OF APPEALS, DIVISION III, STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 30834-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | ORDER AMENDING OPINION |
| | ) | |
| RUSSELL ALLEN HARRINGTON, | ) | |
| | ) | |
| Appellant. | ) | |

The court hereby amends its opinion filed June 17, 2014, as follows:

Page 1 shall be amended to designate it is an opinion published in part.

Page 7, second line, shall be amended to reflect the initial M. in lieu of the minor's name.

Page 26, second paragraph, the following line shall be added: We affirm the conviction of Russell Harrington for first degree kidnapping.

Page 26, the third paragraph shall be deleted and replaced with: The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.

DATED: July 22, 2014

PANEL: Judges Fearing, Siddoway, Rawson, JPT

FOR THE COURT:

LAUREL H. SIDDOWAY, Chief Judge

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30834-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RUSSELL ALLEN HARRINGTON, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — A jury found Russell Harrington guilty of first degree kidnapping

of his then wife Michelle Harrington. On appeal, Mr. Harrington contends (1)

insufficient evidence supports his conviction for first degree kidnapping, and (2) the

statute defining first degree kidnapping is void for vagueness. Mr. Harrington also

contends in his statement of additional grounds that his counsel was ineffective. We

reject Mr. Harrington's contentions and affirm his conviction.

FACTS

Russell and Michelle Harrington were married for 21 years. They have two

children and had two guns, a .357 caliber handgun Russell always holstered at his hip and

Michelle's grandfather's old rifle. Russell and Michelle lived paycheck to paycheck on

Michelle's income. Despite marital troubles, the couple lived together at their Benton

City home until December 30, 2009, when Russell held Michelle at gunpoint.

In June 2003, Russell Harrington was severely electrocuted at work. The electricity burned his nerves and myelin coating essential for the proper functioning of the nervous system. Russell later suffered a stroke. Russell could no longer work, he used a cane, and he increasingly ingested medications to combat chronic pain. Michelle eventually concluded that Russell abused pain medications. Russell stayed home and cared for his and Michelle's daughter and son. In 2009, their son was nine-years-old and their daughter had graduated from high school and moved from the home. Michelle tried to leave Russell multiple times, but stayed for their children's sake or because Russell threatened suicide.

In November 2009, Michelle told Russell that she wanted to divorce. Michelle testified at the criminal trial: "At this point the behavior from Russell was becoming more and more unpredictable. He was becoming a little more violent and controlling and at this point it was about my son . . . ." Report of Proceedings (RP) at 52. In response, Russell expressed concerns about no longer receiving health insurance through Michelle's work and his lack of income. Michelle and Russell agreed to continue living together through the holidays. Russell again contemplated suicide.

On December 13, 2009, Russell Harrington wrote a will, a burial plan, and letters to loved ones and family. He attempted suicide the next day by grounding and liquefying different pills and placing the mixture into a livestock syringe. Russell parked his truck

2

on the side of the road and phoned Michelle, their daughter, his sister, and his mother to inform them of his intentions. Russell's mother called 911. In the meantime, Russell injected the syringe into his arm, but, when he pressed the syringe's plunger, it would not move. Russell reinserted the syringe and tried again. The plunger again would not depress. His suicide attempt having been frustrated, Russell returned home.

A police officer responded to Russell Harrington's mother's emergency call by journeying to the Harrington home. Russell lied to the officer, denying that he had just tried to kill himself.

On December 17, 2009, Michelle and Russell Harrington and their son went to Oregon to celebrate Christmas with their respective families. The couple did not discuss divorce while in Oregon. On December 21, Russell purchased, in Oregon, a .40 caliber handgun. While in The Dalles, Russell filtered his mixture of pain medications and returned it to the syringe, by following instructions he found on the Internet.

On December 27, Michelle and Russell returned to their Benton City home. The couple discussed divorce again. Russell suspected infidelity by Michelle based on texts he found on her cell phone. Michelle told Russell that she wanted custody of their son.

Russell asked Michelle to miss work on Wednesday, December 30, so they could meet with a realtor about placing their home on the market. On December 30, Michelle

left her son at daycare around 8 a.m. and immediately returned home. The trial testimony of Michelle and Russell as to what thereafter occurred diverges.

According to Michelle Harrington, Russell met her as she parked her car at the home. Russell told Michelle that his phone died while he talked to his grandmother. Russell asked to borrow Michelle's phone to again call his grandmother. Russell said he needed to retrieve the hospital's number from their bedroom, and Michelle followed Russell inside and into the bedroom. Russell pretended to search for the phone number, while Michelle helped.

Michelle Harrington testified that Russell abruptly shut the bedroom door, and he ordered Michelle to sit. Russell said "I have ten hours before anyone knows you're gone before you are due to . . . pick up [our son]." RP at 72. Russell told Michelle that no realtor was coming, that their son would have two parents or no parents, and that "he has got everything ready this time. He is going to do everything right." RP at 72. Russell pulled down the bed's cover to reveal a syringe, bottle of scotch, shot glass, empty pill bottles, can of Pepsi, and duct tape.

Michelle noticed that Russell wore a holster holding a gun. With one hand pushing Russell away, Michelle slid a finger on her other hand across her iPhone in order to make a call. Russell pulled his gun and aimed it at Michelle. Russell took Michelle's phone and threw it across the room.

4

Michelle Harrington's iPhone fortuitously dialed her coworker, Penny Bailey-Sherman. Bailey-Sherman recognized Michelle's and Russell's voices and heard Russell speaking angrily. Michelle sobbed hysterically. Bailey-Sherman heard Russell threaten to kill Michelle. She also heard Russell tell Michelle to drink something. Bailey-Sherman shared the call with another coworker and her supervisor by placing it on speakerphone. The supervisor comprehended the gravity of the circumstances, obtained Michelle's address from Human Resources, and called 911.

According to Michelle Harrington, she tried to break a window to escape, but Russell pushed her back with his cane and forced her to sit. Russell ordered Michelle to sit with her butt flush to the ground. Russell forced Michelle to drink a shot of the scotch, while pointing the gun at her. The scotch was from their wedding, twenty years earlier. Russell also gave Michelle the Pepsi as a chaser. He poured another shot, but Michelle refused to drink it out of concern the alcohol would increase her vulnerability. Michelle believed that Russell intended to kill her. Michelle testified: "He got really mad because I wouldn't take another shot so he took me by my throat with his hand and pushed me up against the wall and he had the gun shoved into my forehead right between my [e]yes and he had me shoved up against the wall." RP at 76-77. Russell repeatedly pushed Michelle toward the bedroom closet. She fell backwards into clothes.

5

According to Michelle Harrington, Russell then yelled at Michelle, "what is that, what is that, what did you do?" RP at 77. Michelle did not understand the question. Russell hurriedly left their bedroom, but before Michelle could escape, Russell returned. He told Michelle that police had arrived, and he repeated, "What did you do? Who did you call?" RP at 77. Michelle, with greater fear, expected Russell would then kill her. Instead, Russell put his gun in his mouth. Then, tossing the gun aside, Russell grabbed the syringe and injected himself with his homemade stew of pain medications. Russell collapsed, and Michelle ran past Russell and out of the home to safety.

The saga continued. Russell Harrington crawled out of the house and yelled for police to shoot him. Russell then crawled back inside, but minutes later returned outside the house with a shoe in his hand. Police restrained him. An ambulance transported him to Kadlec Hospital, where he was placed in a medically induced coma. Once awake, Russell called Michelle to ask if she was "in trouble." RP at 489. Michelle responded that they "probably shouldn't be talking" and hung up. RP at 489.

Russell Harrington testified that he only intended to kill himself. Russell admitted to hiding a syringe, pills, notes, and other items under the bed's cover. But after he pulled down the covers, Michelle pointed his .357 caliber handgun at him. Russell claims he tried to calm his wife by offering her a drink, testifying, "I remember saying if she took the drink the worst she would have was a hangover, something like that, trying

6

to calm her down. I believe I said you have at least eight hours before you would have to pick up Michael so you would be better by then," implying Michelle would be sober enough to drive later that day. RP at 485. Russell left his handgun in the hallway, concerned that police might shoot at him if he exited the house armed. Russell also testified he was primarily concerned that Michelle might be shot in the cross fire.

Police photographed Michelle shortly after the December 30 assault. One photo showed a faint mark on her forehead where Russell pressed the gun against her. A forensic expert testified that he found multiple persons' deoxyribonucleic acid (DNA) on the handgun Russell left in the hallway. But the expert testified that tests were inconclusive as to whether any of the DNA came from Michelle.

During trial, Michelle testified concerning the conditions at the couple's home after the December 30 confrontation:

> I found several things over the next couple days and one of the things that I found that came out was that our phone lines were cut or disabled in some manner. The [I]nternet had been messed with in some way. All of the passwords were changed. We found [Russell's] cell phone, the battery was missing from his cell phone. I had no way to communicate except for my cell phone.

RP at 81.

## PROCEDURE

The State of Washington charged Russell Harrington with first degree kidnapping in violation of RCW 9A.40.020 and sentence enhancements for domestic violence, use of

7

a firearm, and deliberate cruelty. Russell asserted a defense of diminished capacity. At trial, expert psychologists disagreed about whether Russell had the ability to form intent.

The trial court instructed the jury that, to find Russell guilty of first degree kidnapping, it must find "[t]hat the defendant abducted that person with intent (a) to inflict bodily injury on the person; or (b) to inflict extreme mental distress on that person." Clerk's Papers (CP) at 128. The trial court further defined "bodily injury" but did not further define "extreme mental distress." CP at 126. During deliberations, the jury asked the trial court to define the phrase "extreme mental distress." CP at 151. The trial court responded: "You must depend on your collective memory of the evidence and the Court's instructions." CP at 151. The jury found Russell Harrington guilty of first degree kidnapping. By special verdicts, the jury found: Russell used a firearm; Russell and Michelle were members of the same household, entailing domestic violence; but Russell's conduct during the commission of the crime did not "manifest deliberate cruelty to the victim." RP at 153-55. The trial court sentenced Russell to 111 months confinement followed by 32 months community custody.

## LAW AND ANALYSIS

ISSUE 1: SUFFICIENCY OF THE EVIDENCE. Does sufficient evidence support Mr. Harrington's conviction for first degree kidnapping?

ANSWER: Yes.

8

Evidence is sufficient to convict a defendant of a crime if a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Both direct and circumstantial evidence may support the jury's verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). When reviewing a claim of insufficiency of evidence, this court draws all reasonable inferences in favor of the State. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977). Only the trier of fact, the jury in this case, weighs the evidence and judges the credibility of witnesses. *State v. Carver*, 113 Wn.2d 591, 781 P.2d 1308, 789 P.2d 306 (1989).

The jury found Russell Harrington guilty of first degree kidnapping in violation of RCW 9A.40.020. RCW 9A.40.020 reads:

> (1) A person is guilty of kidnapping in the first degree if he or she intentionally abducts another person with intent:
>> (a) To hold him or her for ransom or reward, or as a shield or hostage; or
>> (b) To facilitate commission of any felony or flight thereafter; or
>> (c) To inflict bodily injury on him or her; or
>> (d) To inflict extreme mental distress on him, her, or a third person; or
>> (e) To interfere with the performance of any governmental function.
> (2) Kidnapping in the first degree is a class A felony.

Kidnapping comes in two degrees. The lesser crime of kidnapping in the second degree is defined as intentionally abducting another person under circumstances not amounting to kidnapping in the first degree and is a class B felony. RCW 9A.40.030.

9

The defendant's intent distinguishes the two degrees of kidnapping. *State v. Garcia*, 179 Wn.2d 828, 838, 318 P.3d 226 (2014). While kidnapping in the second degree requires only an intentional abduction, kidnapping in the first degree requires an additional specific intent. *Garcia*, 179 Wn.2d at 838.

The State claims Russell Harrington was guilty of first degree kidnapping under either subsection (c) or (d) of RCW 9A.40.020. According to the State, Mr. Harrington, upon abducting Michelle, either wished to inflict bodily injury on her or intended to inflict extreme mental distress on her. Mr. Harrington challenges the sufficiency of evidence to find that he intentionally abducted Michelle. He also challenges the sufficiency of evidence to conclude that he either intended to cause bodily injury or to inflict extreme mental distress.

We first determine if there was sufficient evidence to convict Russell Harrington of intentional abduction. A predicate statute, RCW 9A.40.010(1), defines "abduct" as:

> Abduct means to restrain a person by either (a) secreting or holding the person in a place where that person is not likely to be found, or (b) using or threatening to use deadly force.

In turn, the statute defines "restrain" as "to restrict another person's movements without consent and without legal authority in a manner that interferes substantially with his or her liberty." RCW 9A.40.010(6).

10

Russell Harrington intentionally abducted Michelle. Russell restricted his wife's movement by displaying deadly force when he shut the bedroom door, commanded her to sit on the floor, forced her at gunpoint to drink alcohol, and shoved and held her against the wall at gunpoint.

The abduction was planned and premeditated. Russell asked Michelle to place their son in daycare and take the day off work to meet with a realtor. There was no realtor. Russell orchestrated a window of ten hours before anyone would realize that Michelle was missing. Russell cut phone lines in the home, asked to borrow Michelle's phone, and lured her into their bedroom on the pretense of searching for a phone number. Russell hid scotch, duct tape, and a syringe filled with liquefied pain medications in the room.

Because RCW 9A.40.020 lists five distinct specific intentions sufficient for first degree kidnapping, first degree kidnapping is an alternative means crime. An alternative means crime categorizes distinct acts that amount to the same crime. *State v. Peterson*, 168 Wn.2d 763, 770, 230 P.3d 588 (2010). When a defendant challenges the sufficiency of the evidence in an alternative means case, appellate review focuses on whether sufficient evidence supports each alternative means. *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012); *State v. Kintz*, 169 Wn.2d 537, 552, 238 P.3d 470 (2010). When alternative means of committing a single offense are presented to a jury, each

alternative means must be supported by substantial evidence in order to safeguard a defendant's right to a unanimous jury determination. *Garcia*, 179 Wn.2d at 836-37; *State v. Smith*, 159 Wn.2d 778, 783, 154 P.3d 873 (2007). Here, the trial court instructed the jury on two alternate means, requiring it to find beyond a reasonable doubt that Russell Harrington abducted Michelle Harrington "with intent (a) to inflict bodily injury on the person; or (b) to inflict extreme mental distress on that person." CP at 128. We review the evidence supporting each alternative.

The first alternative charged is to inflict bodily injury on the kidnap victim. RCW 9A.40.020(1)(c). "Bodily injury" "means physical pain or injury, illness, or an impairment of physical condition." RCW 9A.04.110(4)(a). Mr. Harrington intentionally impaired Michelle's physical condition when he forced her to consume scotch. Russell intended to cause Michelle physical pain when he grabbed her by the throat and threw her against a wall.

The second alternative charged is to act with intent to inflict extreme mental distress. RCW 9A.40.020(1)(d). "Extreme mental distress" is not defined by statute. *Garcia*, 179 Wn.2d at 842. Second degree kidnapping involves abduction by use of deadly force. Therefore, in order to distinguish between first and second degree kidnapping, "extreme mental distress" must mean more mental distress than a reasonable person would feel when restrained by deadly force. *Garcia*, 179 Wn.2d at 843. When

12

measuring the distress, we focus on the mental state of mind of the defendant, not the victim, and ask whether the defendant intended to inflict more distress than reasonably attributed to an abduction by lethal force. *Garcia*, 179 Wn.2d at 843. This is a fact specific determination. *Garcia*, at 843. In some cases, the threat of deadly force may be so extreme as to evidence intent to cause extreme mental distress. *Garcia*, 179 Wn.2d at 843. Nevertheless, we should not assume that the defendant intended to inflict extreme mental distress in each instance in which the defendant showed a deadly weapon. *Garcia*, 179 Wn.2d at 843.

We have no measuring device to determine when emotional distress becomes "extreme." No Washington decision relates an example of extreme emotional distress for purposes of first degree kidnapping.

Although the sufficiency of evidence as to intent to cause extreme mental distress may be a close call, we conclude the jury heard sufficient evidence. The State needed to prove Russell Harrington wanted to cause more mental distress than the distress normally accompanying restraint by deadly force. We note that a victim can be restrained by deadly force without the perpetrator actually threatening to kill the victim. The perpetrator may restrain the victim by aiming the gun at the victim and telling the victim not to move or leave a room without specifically telling the victim he intends to kill her.

13

Actually threatening to kill the victim under the circumstances where the victim believed she would die immediately can add a layer to the mental distress.

Russell Harrington intended to inflict extreme mental distress by explicitly and repeatedly threatening to kill his wife. Michelle's distress resulting from a reasonable belief that she would die and never see her son again could be as extreme as distress can reach. Mr. Harrington expressed his intent by threatening that the son would have two parents or no parents. Russell spun a terrorist's web, tricked Michelle into it, and then employed extreme mental distress to compel Michelle to remain married. Even assuming Russell's story that he only threatened to kill himself, Michelle would have suffered extreme mental distress. Severe distress follows from one announcing he will kill himself in front of another.

Russell Harrington argues that he must not have intended to inflict extreme emotional distress because the jury, by special verdict, declined to find that his "conduct during the commission of the crime" "manifest[ed] deliberate cruelty to the victim." CP at 155. The court instructed the jury, "'Deliberate cruelty' means gratuitous violence or other conduct which inflicts physical, psychological, or emotional pain as an end in itself, and which goes beyond what is inherent in the elements of the crime or is normally associated with the commission of the crime." CP at 144. Thus, "deliberate cruelty" includes "gratuitous violence;" whereas, inflicting "extreme emotional distress" need not

14

be gratuitous. We find no inconsistency in the general verdict and the special verdict and any inconsistency would be irrelevant.

Inconsistent verdicts are not necessarily void. *State v. Goins*, 151 Wn.2d 728, 733, 92 P.3d 181 (2004). As noted in *State v. Goins*, 151 Wn.2d at 733, juries return inconsistent verdicts for various reasons, including mistake, compromise, and mercy. Regardless, courts refrain from second guessing the jury where lenity provides a plausible explanation for the inconsistency. *Goins*, 151 Wn.2d at 735. When inconsistent verdicts call into question a guilty verdict, the reviewing court must verify that the guilty verdict was supported by sufficient evidence. *Goins*, 151 Wn.2d at 737; *State v. McNeal*, 145 Wn.2d 352, 359, 37 P.3d 280 (2002). We have already verified the sufficiency of the evidence. Thus this additional argument also fails.

ISSUE 2: VOID FOR VAGUENESS. Does the phrase "intent to inflict extreme emotional distress" render RCW 9A.40.020 unconstitutionally vague?

ANSWER: No.

Russell Harrington complains about uncertainty in the crucial phrase "inflict extreme mental distress" found in RCW 9A.40.020(1)(d), the statute upon which the jury convicted him. According to Mr. Harrington, juries are left to wonder and guess at what the term means and how to measure the word "extreme." Thus, he challenges the statute

15

as unconstitutionally vague. We undergo an amorphous examination of the phrase "extreme mental distress" to determine its measure of firmness.

A tape measure can measure distances to a sixteenth of an inch. In between each sixteenth of an inch, according to metrology, is "uncertainty." One may reduce that uncertainty by the use of an electron microscope which can measure each 200 nanometers, a nanometer being a billionth of a meter.

Words, not numbers, are the material from which legislatures fabricate statutes and by which statutes attempt to denote reality and identify, describe, and distinguish human conduct. But words are funny things. We may use a word or phrase to convey one meaning and the reader or listener may receive a different meaning. Or the reader may question the meaning or not conceive any meaning. Thus, in order to place the reader into our mind and our world, we must carefully choose our words wisely and employ terms that convey a concrete meaning to the reader. Some words provide more definity than other words. But since words are not geometrical objects, we may not quantify the definity of words and terms or measure meaning with numerical precision.

Words are mere signs or symbols of meaning and thought and are never exact. Uncertainty prowls in all words and phrases. This court's important task of determining the line between permissible uncertainty and impermissible uncertainty in a statute, upon which task a conviction will be affirmed or reversed, is problematic. Often we may not

intelligently articulate why some words pass constitutional muster while other do not, and we can only reaffirm and paraphrase the abiding words of Mr. Justice Stewart: "We know it when we read it." *Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S. Ct. 1676, 12 L. Ed. 2d 793 (1964) (Stewart, J., concurring).

Let us assume the state legislature adopts a law criminalizing the "possession of a bad thing." Citizens would puzzle over what objects they may not possess. The word "thing" is indefinite and the word "bad" is overladen with value judgments. A "thing" could even include an "idea" such that one might be guilty of a crime by possessing a bad thought. Some law enforcement officers might consider guns bad and others view paintings of nudes evil, such that possessing one or both might lead to prosecution. We could not know what the legislature intended to criminalize. This fictitious statute uses esoteric and abstract words. In this appeal, we ask whether "inflict extreme mental distress" is impaled with abstraction and whether the legislature could have better expressed its intent.

The criminal law uses the term "vagueness" rather than "uncertainty" when analyzing a word and seeks to reduce vagueness and promote specificity. The law demands that a crime be described in specific, not vague, language, so that a citizen as well as law enforcement may comprehend the variety of human conduct a legislature intends to proscribe, prevent, and punish. *City of Spokane v. Douglass,* 115 Wn.2d 171,

179, 795 P.2d 693 (1990). The legislature has a duty to set forth statutes with specificity. *State v. Richmond*, 102 Wn.2d 242, 248, 683 P.2d 1093 (1984).

In the State of Washington, the basis of the demand for precision comes from three constitutional provisions. Both the United States Constitution and the State of Washington Constitution prohibit the government from depriving one of life, liberty, or property without due process of law. U.S. CONST. amend. XIV, § 1; CONST. art. I, § 3. In addition, article I, section 22 of the Washington Constitution, grants an accused, in a criminal prosecution, "the right . . . to demand the nature and cause of the accusation against him." From these constitutional provisions arises the void for vagueness doctrine.

In his brief, Mr. Harrington relies solely upon the Fourteenth Amendment to the United States Constitution. Thus, we will not address whether the Washington Constitution provides him greater protection. Washington courts have never decided whether the state constitution provides superior rights to the accused, in the context of vague statutes, since no appellant has analyzed the question under the *Gunwall* analysis. *See State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986) *(for cases declining to apply the Gunwall analysis in the context of a vagueness challenge see City of Bellevue v. Lorang*, 140 Wn.2d 19, 23 n.3, 992 P.2d 496 (2000); *State v. Lee*, 135 Wn.2d 369, 386-87, 957 P.2d 741 (1998); *State v. Halstien*, 122 Wn.2d 109, 116 n.3, 857 P.2d 270 (1993); *Spokane v. Douglass*, 115 Wn.2d 171, 177, 795 P.2d 693 (1990). Despite

18

resolving the issue under the United States Constitution, we review mostly Washington decisions.

The due process clause of the Fourteenth Amendment to the United States Constitution requires a statute to provide fair notice of the conduct it proscribes. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972); *State v. Watson*, 160 Wn.2d 1, 6, 154 P.3d 909 (2007). A statute is unconstitutionally vague if it fails either of two requirements. *Douglass*, 115 Wn.2d at 178. A statute is void if either (1) the statute does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed, or (2) the statute does not provide ascertainable standards of guilt to protect against arbitrary enforcement. *State v. Watson*, 160 Wn.2d 1, 6 (2007); *State v. Williams*, 144 Wn.2d 197, 203, 26 P.3d 890 (2001). We wonder, but need not decide, if the two requirements are redundant. We assume difficulty in some situations in applying the two standards because they themselves employ abstract terms. When applying the requirements, courts do not interview ordinary people or law enforcement officers to determine whether they find concrete meaning in a statute. Indeed some commentators and courts have suggested the void for vagueness doctrine is ironically itself void for vagueness. *State v. Smith*, 111 Wn.2d 1, 12, 759 P.2d 372 (1988); *City of Seattle v. Eze*, 111 Wn.2d 22, 27-28, 759 P.2d 366 (1988). In determining whether the phrase "inflict extreme mental distress" is void,

19

we turn to more definite principles of law and compare the phrase to phrases employed by other statutes and addressed in other decisions. Later we apply the term in the context of the facts behind Russell Harrington's conviction.

Our courts do not apply the void for vagueness doctrine casually; rather, we approach a vagueness challenge with a strong presumption in favor of the statute's validity. *State v. Smith*, 111 Wn.2d at 5. One who challenges a statute's constitutionality for vagueness bears the burden of proving beyond a reasonable doubt that it is unconstitutionally vague. *Watson*, 160 Wn.2d at 11. When assessing whether a statute is void for vagueness, the context of the entire statute is evaluated, and the language of the statute is afforded a sensible, meaningful, and practical interpretation. *Douglass*, 115 Wn.2d at 180. A statute is not void for vagueness merely because some terms are not defined. *Douglass*, 115 Wn.2d at 180. If all words in a statute were defined there would be no end to the definitions because we would need to define the defining words and the definer's defining words. A statute is not unconstitutionally vague merely because a person cannot predict with precise certainty the exact point at which his or her actions may be classified as a recent overt act. *In re Detention of Danforth*, 173 Wn.2d 59, 73, 264 P.3d 783 (2011); *Eze*, 111 Wn.2d at 26. If persons of ordinary intelligence can understand what the ordinance proscribes, notwithstanding some possible areas of disagreement, the ordinance is sufficiently definite. *Douglass*, 115 Wn.2d at 179.

20

Simply because the legislature could have drafted the statute with more precision, we do not invalidate the statute for vagueness. *Watson*, 160 Wn.2d at 11.

The statute must instead "provide 'minimal guidelines . . . to guide law enforcement.'" *Danforth*, 173 Wn.2d at 73. These determinations are not made in a vacuum, but rather, the question is whether the terms are not inherently subjective in the context in which they are used. *Danforth*, 173 Wn.2d at 74; *Worrell*, 111 Wn.2d 537, 544, 761 P.2d 56 (1988). Additionally, the mere fact that a statute may require some degree of subjective evaluation by a police officer to determine whether the statute applies does not mean the statute is unconstitutionally vague. *Danforth*, 173 Wn.2d at 74; *Am. Dog Owners Ass'n v. City of Yakima*, 113 Wn.2d 213, 216, 777 P.2d 1046 (1989). "Under the due process clause, the enactment is unconstitutional only if it invites an inordinate amount of police discretion." *Danforth*, 173 Wn.2d at 74; *Douglass*, 115 Wn.2d at 181.

Washington courts have frequently addressed whether a criminal statute is void for vagueness. A list of the cases and their rulings is placed in an appendix. The trend in the Washington Supreme Court is to affirm the constitutionally of legislation against vagueness challenges. The phrase "inflict extreme mental distress" in RCW 9A.40.020(1)(d), challenged by Russell Harrington, is no more esoteric than "loud and raucous" found permissible in *City of Seattle v. Eze*, 111 Wn.2d 22; "without lawful

21

authority" held allowable in *State v. Worrell*, 111 Wn.2d 537; "interferes substantially with his liberty" also found sufficient in *Worrell;* "lewd, lascivious, profane, indecent, or obscene words or language" found constitutional in *State v. Dyson*, 74 Wn. App. 237, 872 P.2d 1115 (1994); "repeatedly harasses" approved in *State v. Bradford*, 175 Wn. App. 912, 308 P.3d 736 (2013); or "intent to harass, intimidate or torment" held permissible in *City of Seattle v. Huff*, 111 Wn.2d 923, 767 P.2d 572 (1989). But then again comparing the definity of one word or phrase to another word or phrase is impossible.

In this context, the legislature would encounter difficulty using other words to denote its intention. "Mental distress" may not be measured, so employing the word "extreme" is a legitimate use of language. "Extreme mental distress" adequately describes a state of mind to which the legislature wishes to assign criminal responsibility.

To determine if a statute is unconstitutionally vague, a court may read, into the statute, court decisions which define the statute's terms. *Douglass*, 115 Wn.2d at 180. After trial in this case, the state Supreme Court issued *State v. Garcia*, 179 Wn.2d 828, which defines, in part, "extreme mental distress" as distress of a higher degree than that distress normally accompanying a kidnapping under threat or use of deadly force. We do not know if we can use this recent decision to analyze the constitutionality of RCW 9A.40.020, since the definition was not available at trial. But we determine we need not

22

rely on the *Garcia* definition.

Courts ignore the facts of the case if the challenger seeks to void a statute in its entirety. *City of Bellevue v. Miller*, 85 Wn.2d 539, 541, 536 P.2d 603 (1975). Washington courts now limit a facial challenge to statutes that implicate free speech rights. *State v. Halstien*, 122 Wn.2d 109, 117, 857 P.2d 270 (1993). If the statute does not implicate first amendment rights, the vagueness challenge is evaluated by examining the statute as applied under the particular facts of the case. *State v. Coria*, 120 Wn.2d 156, 163, 839 P.2d 890 (1992); *Douglass*, 115 Wn.2d at 182. The challenged law is tested for unconstitutional vagueness by inspecting the actual conduct of the party who challenges the ordinance and not by examining hypothetical situations at the periphery of the ordinance's scope. *Danforth*, 173 Wn.2d at 72. This limitation is helpful in resolving Russell Harrington's challenge, since he concedes that his case does not implicate the First Amendment. We may examine RCW 9A.40.020 as it applies to facts of this case.

The jury, when deliberating, asked the trial court to define "extreme mental distress." Our trial court declined. Russell Harrington contends the jury question clinches his constitutional argument, but it does not necessarily follow that the phrase is unconstitutionally vague. The jury may have *desired* a definition rather than *needed* a definition. The trial court responded: "You must depend on your collective memory of

23

the evidence and the court's instructions." CP at 151. The jury then found Mr. Harrington guilty of first degree kidnapping.

Otherwise, Mr. Harrington relies on *State v. Williams*, 144 Wn.2d 197, 26 P.3d 890 (2001) to argue that "extreme mental distress" is unconstitutionally vague. There, Chris Williams threatened the supervisor that fired him, stating "Motherf . . . you better give me my check," referring to his final paycheck. A bystander mouthed: "He has a gun." The state charged Williams with misdemeanor harassment under former RCW 9A.46.020 (1992), which provided, "Without lawful authority, the person knowingly threatens . . . [m]aliciously to do any other act which is intended to substantially harm the person threatened or another with respect to his or her physical or mental health or safety." The *Williams* court asked "does the statute prohibit a person from making threats which cause others mere irritation or emotional discomfort or does it only prohibit those threats which cause others to suffer a diagnosable mental condition?" *Williams*, 144 Wn.2d at 204. Finding that a plain reading of the statue provided no answer, the court held RCW 9A.46.020(1)(a)(iv) as unconstitutionally vague to the extent of the phrase "mental health." *Williams*, 144 Wn.2d at 204, 212.

*Williams* does not provide us an answer to Russell Harrington's challenge. "Extreme mental distress" is not subject to the same range of interpretation as "mental health" at issue in *Williams*. "Extreme mental distress" lacks concreteness. "Ordinary

24

people" may disagree in particular instances as to what "mental distress" is "extreme." But the extent of the phrase's indefiniteness is lesser than "mental health." Whereas substantial harm to "mental health" might entail a diagnosable mental condition, best assessed by a psychologist, most people have at least indirect experience with "extreme mental distress" and can judge when it occurs. The term "health" may be more subjective than the word "distress." "Mental distress" is a phrase of common meaning. "Extreme" is a common word. The modifier "extreme" removes some of the subjectivity of the term "mental distress."

The statute in *Williams* regulated the content of speech. The *Williams* court noted, "'we are especially cautious in the interpretation of vague statutes when first amendment interests are implicated.'" 144 Wn.2d at 204 (quoting *State v. Lorang*, 140 Wn.2d 19, 31 (2000)). Again, Mr. Harrington agrees that RCW 9A.40.020 does not implicate the First Amendment. This difference between the two cases is of prime importance.

Because RCW 9A.40.020(1)(d) does not implicate free speech, this court need not examine RCW 9A.40.020's "extreme mental distress" in a vacuum but rather through the lens of the kidnapping of Michelle Harrington. The meaning of "extreme mental distress" reaches its zenith when applied to the facts of this case. Michelle believed herself dead at the hand of the man who fathered her son, a son she would not see again. A threat to kill someone, particularly when the threat is immediate and with a gun

25

pressing on one's forehead, causes as much mental distress as any act can. As an extreme male bully, Russell Harrington intended Michelle to suffer that distress in order to compel her by the mouth of a gun to remain married. Admittedly "extreme mental distress" carries some uncertainty, but little ambiguity in the context of the distress imposed by Russell Harrington on his former wife.

In short, Russell Harrington fails to meet his burden of showing RCW 9A.40.020 unconstitutionally vague.

The panel has determined that the rest of the opinion should not be published.

ISSUE 3: INEFFECTIVE ASSISTANCE OF COUNSEL. Did Russell Harrington receive ineffective assistance of counsel?

ANSWER: No.

Russell Harrington references three events that allegedly resulted in ineffective assistance of counsel. First, Mr. Harrington alleges the State kept him in a condition that impaired his ability to communicate during critical stages, citing *United States v. Stringer*, 521 F.3d 1189 (9th Cir. 2008). This interference, Mr. Harrington claims, caused defense counsel to pursue an objectively unreasonable trial strategy of admitting guilt to argue "diminished capacity." Second, Russell Harrington assigns error to defense counsel admitting, "At best, our defense is diminished capacity." RP at 2 (Aug. 18, 2010). According to Mr. Harrington, the mindset of counsel may have persuaded the jury

26

that he was guilty as charged. Third, Mr. Harrington contends that counsel failed to investigate and prepare for trial.

Appellate courts strongly presume counsel was effective. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To prevail on an ineffective assistance claim, a defendant must show his attorney was not functioning as counsel as guaranteed by the Sixth Amendment. *In re Pers. Restraint of Gentry*, 137 Wn.2d 379, 400-01, 972 P.2d 1250 (1999) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Russell Harrington must show:

> (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.

*McFarland*, 127 Wn.2d at 334-35. If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim that the defendant received ineffective assistance of counsel. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).

After our review of the trial record, we conclude that Russell Harrington's contention that counsel performed deficiently fails. Mr. Harrington points to no instances of the State "deliberately interfering" with his attorney-client relationship. His counsel uttered the remark, "At best, our defense is diminished capacity," at a preliminary hearing

27

when arguing that DNA evidence was unnecessary. RP at 2 (Aug. 18, 2010). Defense counsel made no similar comment before the jury and the record shows counsel to be a fervent advocate for his client.

Russell Harrington claims that his counsel failed to challenge Michelle's testimony as inconsistent with regard to his use of a cane to walk and stand, but then he cites the record where his counsel pursued this line of impeachment. Mr. Harrington argues "it was objectively unreasonable for defense counsel not to demonstrate how that version of the iPhone operate[s] to the jury," claiming a demonstration would have undermined Michelle's credibility. Statement of Additional Grounds (SAG) at 24. Again, defense counsel pursued this line of impeachment, questioning how Michelle knew who her phone called. Mr. Harrington contends that defense counsel should have obtained daycare records showing that Michelle "had been taking their son to the daycare." SAG at 27. When the State attempted to construe their son attending daycare as unusual, defense counsel successfully objected. Later, defense counsel argued that, as an alternate reason for their son being in daycare, Michelle was preparing for her childcare needs following the divorce. In short, every allegation of ineffectiveness conflicts with the trial record.

28

## CONCLUSION

We affirm the conviction of Russell Harrington for first degree kidnapping.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Rawson, J.P.T

29

APPENDIX

Courts have declared unconstitutional the following laws:

1. The Supreme Court struck as void for vagueness a Bellevue prowling statute that declared anyone guilty "who wanders or prowls in a place . . . under circumstances which manifest an unlawful purpose." *City of Bellevue v. Miller*, 85 Wn.2d 539, 536 P.2d 603 (1975), *impliedly overruled in State v. Smith*, 111 Wn.2d 1, 14 n.3, 759 P.2d 372 (1988).

2. The term "without lawful order" in a city criminal trespass ordinance was unconstitutionally vague. *City of Seattle v. Rice*, 93 Wn.2d 728, 612 P.2d 792 (1980) impliedly overruled in *State v. Smith*, 111 Wn.2d 1, 14 n.3, 759 P.2d 372 (1988).

3. Former RCW 9A.76.170, a State bail jumping statute that prohibited the "knowingly" failure "without lawful excuse to appear," was unconstitutional because of the phrase "lawful excuse." *State v. Hilt*, 99 Wn.2d 452, 662 P.2d 52 (1983).

4. Former RCW 26.20.030(1)(b), which criminalized willfully failing to support one's children "without lawful excuse," was unconstitutionally vague. *State v. Richmond*, 102 Wn.2d 242, 683 P.2d 1093 (1984).

5. City ordinance making it a nuisance for a dog owner or occupant of a premises on which a dog was kept to allow the dog to disturb or annoy any other person or neighborhood by frequent or habitual howling, yelping, or barking did not provide

30

adequate notice to citizens of unlawful conduct or adequate standards to prevent arbitrary enforcement and thus was void for vagueness. *City of Spokane v. Fischer*, 110 Wn.2d 541, 754 P.2d 1241 (1988).

6. The phrase "without purpose of legitimate communication" in city telephone harassment ordinance unconstitutionally vague. *City of Bellevue v. Lorang*, 140 Wn.2d 19, 992 P.2d 496 (2000).

7. The phrase "mental health" in the former misdemeanor harassment statute, RCW 9A.46.020, which provided: "Without lawful authority, the person knowingly threatens . . . [m]aliciously to do any other act which is intended to substantially harm the person threatened or another with respect to his or her physical or mental health or safety," is unconstitutionally vague. *State v. Williams*, 144 Wn.2d 197, 26 P.3d 890 (2001).

Washington courts have held the following words and phrases, within various statutes, constitutional despite a vagueness challenge:

1. The words "indecent" and "obscene" in the indecent liberties statute, RCW 9.79.080(2), are not unconstitutionally vague. *State v. Galbreath*, 69 Wn.2d 664, 419 P.2d 800 (1966).

2. Former RCW 9.69.080 pertaining to tampering with a witness with intent to obstruct the course of justice is neither overbroad nor vague. *State v. Hegge*, 89 Wn.2d

31

584, 574 P.2d 386 (1978).

3. The phrase "sexual or other intimate parts" found in RCW 9A.88.100 is not unconstitutionally vague. *Matter of Welfare of Adams*, 24 Wn. App. 517, 601 P.2d 995 (1979).

4. RCW 9.41.270 and a city ordinance proscribing intimidating another with a weapon were not unconstitutionally vague despite a contention that the definitions of "weapons" contained in each were not specific. *State v. Maciolek*, 101 Wn.2d 259, 676 P.2d 996 (1984).

5. Use of the term "lawful" in a harassment statute, former RCW 9A.46.020, does not make statute unconstitutionally vague. *State v. Smith*, 111 Wn.2d 1, 759 P.2d 372 (1988).

6. Terms "without legal authority" and "interferes substantially with his liberty," found in kidnaping statute, RCW 9A.40.010, are not unconstitutionally vague. *State v. Worrell*, 111 Wn.2d 537, 761 P.2d 56 (1988).

7. A municipal ordinance prohibiting naturally grown fences exceeding eight feet in height was not unconstitutionally vague, as applied to property owner who had planted large Douglas firs within two to twelve feet of each other in close proximity to his property line. *Town of Clyde Hill v. Roisen*, 111 Wn.2d 912, 767 P.2d 1375 (1989).

8. An ordinance criminalizing telephone calls threatening the listener or his

family with physical or property damage and made with "intent to harass, intimidate or torment" was not unconstitutionally overbroad or vague. *City of Seattle v. Huff,* 111 Wn.2d 923, 924, 767 P.2d 572 (1989).

9. A City of Yakima ordinance that banned dogs "known by the owners to be pit bulls, specifically the breeds Bull Terrier, American Pit Bull Terrier, Staffordshire Bull Terrier, and American Staffordshire Terrier, as well as dogs 'identifiable' as having any pit bull variety as an element of their breeding" passed constitutional muster despite a challenge to the vagueness of the dog description. *Am. Dog Owners Ass'n v. City of Yakima,* 113 Wn.2d 213, 777 P.2d 1046 (1989).

10. RCW 9.68A.011(3)(a), the sexual exploitation statute, which defines the mental element of that offense as exhibition "for the purpose of sexual stimulation of the viewer" is not void for vagueness. *State v. Bohannon,* 62 Wn. App. 462, 814 P.2d 694 (1991).

11. Tacoma's drug loitering ordinance that declared it "unlawful for any person to loiter . . . in a manner and under circumstances manifesting the purpose to engage in drug-related activity" is not unconstitutional. *City of Tacoma v. Luvene,* 118 Wn.2d 826, 827 P.2d 1374 (1992).

12. The term "sexual motivation" within the meaning of RCW 13.40.135, the juvenile sexual motivation statute, was not unconstitutionally vague. *State v. Halstien*, 122 Wn.2d 109, 857 P.2d 270 (1993).

13. Provisions in RCW 9.61.230, a telephone harassment statute, dealing with "lewd, lascivious, profane, indecent, or obscene words or language" and dealing with calls made at an "extremely inconvenient hour" or made "repeatedly" were not unconstitutionally overbroad or vague. *State v. Dyson*, 74 Wn. App. 237, 247, 872 P.2d 1115 (1994).

14. RCW 9A.46.110, the statute defining the crime of "stalking," is not unconstitutionally vague despite the term "without lawful authority." *State v. Lee*, 135 Wn.2d 369, 957 P.2d 741 (1998).

15. The phrase "loud and raucous" found in city ordinance was not unconstitutional. *City of Seattle v. Eze*, 111 Wn.2d 22, 759 P.2d 366 (1988).

16. RCW 9A.44.130, a sex offender statute requiring registration with authorities "at the time of release from custody," was not unconstitutionally vague. *State v. Watson*, 160 Wn.2d 1, 154 P.3d 909 (2007).

17. The phrase, in former RCW 71.09.030(5), the civil commitment statute, "has committed a recent overt act," defined as "any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind

34

of an objective person who knows of the history and mental condition of the person engaging in the act" and the word "threat" do not render the statute void for vagueness. *In re Detention of Danforth*, 173 Wn.2d 59, 264 P.3d 783 (2011).

18. RCW 9A.46.010, the state stalking statute, which renders one guilty if he "repeatedly harasses" another person during a "course of conduct" is not unconstitutionally vague. *State v. Bradford*, 175 Wn. App. 912, 308 P.3d 736 (2013).