IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

     Respondent,

    v.

JACOB TAYLOR HARRISON,

     Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 73461-0-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: August 15, 2016

BECKER, J. — Jacob Harrison appeals his convictions, arguing in part that he was deprived of a fair trial by prosecutorial misconduct in closing argument to which he did not object. The prosecutor's argument that "the judge is telling you" that DNA[1] evidence is not required to convict was potentially misleading and therefore improper. However, in the context of the entire argument, the argument was not incurably prejudicial.

FACTS

Two assailants robbed Shana Morcom and her boyfriend Brett Losey at gunpoint in a motel room in Everett. Based on this incident, the State charged Jacob Harrison with robbery in the first degree, possession of a controlled substance, and unlawful possession of a firearm in the first degree. According to Morcom, who testified at Harrison's trial, the robbers

---

[1] Deoxyribonucleic acid.

demanded that she and Losey place their valuables on the bed and then ordered them to enter the bathroom and close the door. As soon as they heard the motel room door shut, Morcom and Losey went to the motel office and the clerk called 911. The clerk provided some basic information to the dispatch operator and then gave the telephone to Losey. Losey referred to the attackers as "they," but he identified only one person by name and provided a description of that person that did not match Harrison's physical characteristics. Losey said the firearm was possibly a ".38." According to Losey and Morcom, the men took several items including Losey's wallet, Morcom's cell phone, and a sparkly pink lanyard with keys.

Police officers came to the motel. Morcom told the police that the attacker who wielded the gun was an acquaintance she knew as "J.T."[2] Morcom and Losey described J.T. They described the second suspect as a white male approximately 30 years old with a shaved head and a teardrop tattoo near his left eye, wearing a black shirt and camouflage shorts. This description matched Harrison.

The police tracked Morcom's cell phone to the nearby residence of Amber Mark and Ryan Kelley. Meanwhile, Harrison arrived unannounced at Mark's home. He was carrying a cloth grocery bag. Mark noticed that

---

[2] Several days after the robbery, Jason T. Garcia, who is known as "J.T.," was arrested on outstanding warrants. He had grocery store debit cards on his person in Losey's and Morcom's names. Coincidentally, Jacob T. Harrison and Jason T. Garcia share the same initials, but there was no evidence Harrison has the nickname "J.T."

2

Harrison was holding a cell phone that she had not seen before and was trying to turn it on. Harrison also had a man's wallet. Harrison did not respond when Mark asked him where these items came from, and she assumed they were stolen.

Harrison asked to borrow a pair of Kelley's pants. He went to the garage to change. A few minutes later, several police officers arrived. Upon seeing police vehicles, Kelley told Harrison that if the police were there because of something he had done, he needed to go outside and handle it. Harrison appeared to panic and responded, "'I'm screwed then.'"

Harrison left the house, and the police arrested him. Harrison denied participating in the robbery, but he admitted to the police that he smoked methamphetamine in the victims' motel room on the day of the robbery. A police officer brought Morcom to the scene of the arrest. Morcom said she was 95 percent certain Harrison was the person who committed the robbery with J.T. By the time of trial, Morcom was no longer positive that J.T. was involved. She testified that she was using drugs at the time of the incident which affected her memory and a mutual friend had told her that J.T. was incapable of the behavior. Morcom recalled making statements to the police on the day of the robbery, but she testified that she independently remembered little about the incident.

In a search of Mark's residence, the police found a pair of camouflage shorts in the garage. Also in the garage, they found a pink

3

lanyard with keys, a metal box containing a .38 caliber firearm, a plastic bag containing heroin and Morcom's cell phone. Morcom identified the lanyard and cell phone as hers and the firearm as the one used in the robbery. According to Mark, in the weeks before the robbery, Harrison wanted to and finally did acquire a .38 caliber firearm.

DNA evidence taken from the motel room matched the DNA profile of J.T. and an unknown female contributor. None of the results matched Harrison's DNA profile, and the police did not submit any items from Mark's residence for DNA testing.

Following a six-day trial, the jury found Harrison guilty as charged of first degree robbery, unlawful possession of a controlled substance, and unlawful possession of a firearm in the first degree. With respect to the robbery and drug charges, the jury also found that Harrison or an accomplice was armed with a firearm. Harrison appeals.

## ADMISSION OF 911 CALL

Harrison argues that the court violated his right to confront witnesses by admitting Losey's statements to the 911 operator because Losey did not testify at trial and there was no prior opportunity for cross-examination. See Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Before trial, the parties stipulated to the admission of the recorded 911 call. The defense stated its intent to admit the evidence in its case in

4

chief if the State chose not to do so. Based on the stipulation, and after listening to the recording, the court admitted the exhibit.

At the outset of trial, both sides were aware that Losey was increasingly reluctant to testify. As the trial progressed, it also became apparent that he might be unavailable to testify due to a series of health-related issues.

On the second day of trial, having been instructed to appear, Losey called to report that he was in the hospital following an asthma attack. On the third day, the prosecutor informed the court that Losey would not be released for a couple of days. It was not clear that Losey would be able to testify even if released, due to his severe symptoms. The prosecutor suggested that the court recess for a few days or proceed without Losey. The defense confirmed that it had no objection to either proposal and that the 911 call had already been admitted by stipulation. Defense counsel stated that if Losey did not testify, the defense would agree to admit some of Losey's statements to the police.

The next day, Friday, Losey refused to leave the hospital although he had been medically cleared for discharge. The court authorized the issuance of a bench warrant, and the prosecutor agreed to arrange for Losey to be transported to court to testify later that day. On the way to the court, the police officer, the victim advocate, and Losey were involved in a collision and were taken to the hospital for assessment and treatment. The court recessed until Monday.

On Monday morning, the State informed the court that it would proceed without Losey's testimony. Losey had been released from the hospital on Friday, but he was traumatized, in pain, and medicated. The prosecutor proposed playing the 911 tape for the jury and then resting its case.

At this point, Harrison's counsel asked to withdraw the stipulation to the admission of the recorded 911 call. Counsel stated that the vehicle accident was an "act of God" that warranted revisiting the admission of the evidence. Counsel asserted that the stipulation was based on the expectation that the defense would have the opportunity to cross-examine Losey. Counsel argued that the statements were not excited utterances and were therefore inadmissible hearsay, and that if Losey did not testify, admitting his statements would violate his right to confront witnesses. The court offered to authorize Losey's arrest so that his competency to testify could be assessed. Harrison declined.

After listening to the recorded call again, the court determined that the statements were excited utterances and admission would not violate Harrison's right to confront witnesses. The court also ruled that Losey's unavailability did not provide a basis to allow the defense to withdraw its unconditional stipulation or to reconsider the decision to admit the evidence. The court observed that the evidence was admitted the previous week, the stipulation was not conditioned on Losey's testimony, and that while the State hoped that Losey would testify, it was never a

6

certainty that he would do so. The court noted the importance for litigants to be able to rely on pretrial rulings in order to prepare and try cases. After informing the jury that Losey was "currently unavailable" to testify, the court played the 911 tape for the jury.

Harrison argues that Losey's statements were testimonial because he was reporting a completed robbery and the primary purpose of the call was not to assist in an ongoing emergency. See Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Harrison's argument ignores the fact that the court admitted the evidence upon his stipulation to admissibility. By that stipulation, he waived any claim of a confrontation clause violation. Harrison assumes that when his counsel belatedly indicated that she no longer agreed with the stipulation, the court was required to reconsider the admission of the evidence. Although the court indicated that it would have found the statements contained in the 911 call to be admissible under an exception to the hearsay rule and under Crawford, this alternative ruling was superfluous.[3] The court's denial of the request to withdraw the stipulation and revisit its prior ruling was dispositive.

We review a trial court's admission of evidence for an abuse of discretion. State v. Bradford, 175 Wn. App. 912, 927, 308 P.3d 736

---

[3] The trial court's oral ruling appears to conflate the analysis of whether the statements were excited utterances and whether the admission amounted to a confrontation clause violation. Statements falling within an applicable exception to the hearsay rule may still constitute testimonial hearsay that violates a defendant's rights under the confrontation clause. Davis, 547 U.S. at 821.

(2013), review denied, 179 Wn.2d 1010 (2014). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. Bradford, 175 Wn. App. at 927. Stipulations are favored, and courts will generally enforce them unless good cause is shown to the contrary. State v. Parra, 122 Wn.2d 590, 601, 859 P.2d 1231 (1993). Specifically, a court's decision to admit evidence "where the defendant offers to stipulate" is within the discretion of the trial court. State v. Pirtle, 127 Wn.2d 628, 653, 904 P.2d 245 (1995), cert. denied, 518 U.S. 1026 (1996).

Moreover, a defendant may forfeit the right to review of a claimed violation of the right of confrontation. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); State v. Schroeder, 164 Wn. App. 164, 167-68, 262 P.3d 1237 (2011). And the right to confront witnesses falls into the category of rights that trial counsel can waive as a matter of trial strategy without the defendant's personal expression of waiver. State v. O'Cain, 169 Wn. App. 228, 244-45, 279 P.3d 926 (2012) ("As with decisions implicating trial strategy, the decision to raise a confrontation clause objection is a determination that is reserved to the discretion of competent defense counsel.")

The decision not to contest the admission of the 911 recording was strategically sound. Losey's 911 call identified only J.T. and provided a detailed description that did not match Harrison. If Harrison insisted on having Losey testify in person, there was a risk that Losey would

recognize him and identify him in court as the second assailant. Harrison's rejection of the court's offer to issue a material witness warrant to assess Losey's ability to testify further demonstrates his tactical preference for Losey's 911 statements over Losey's in-person testimony.

Harrison made no showing, here or below, of good cause as to why the court was required to reverse its ruling and relieve him of his previous stipulation. The court's ruling was not an abuse of discretion.

## PROSECUTORIAL MISCONDUCT

In closing argument, defense counsel highlighted the fact that while DNA evidence proved that J.T. had been in the room where the robbery occurred, there was no physical evidence linking Harrison to the motel room. Defense counsel identified several items that the State could have submitted for DNA testing but did not.

Responding to this argument in rebuttal, the prosecutor reminded the jury that while there was no DNA evidence to establish that Harrison was in the motel room, Harrison admitted to smoking methamphetamine in the room. The prosecutor then argued at length that the law does not require DNA evidence to support a conviction and that in light of the circumstantial evidence, the lack of DNA evidence was of no consequence. The prosecutor repeatedly referred to the judge as the source of the argument:

> But the truth about it is that you don't need the DNA. I'm not telling you that. The judge is telling you that.
> Instruction number 5 says, "The evidence that has been presented to you may be either direct or circumstantial.

9

The term 'direct evidence' refers to evidence that is given by a witness who has directly perceived something at issue in this case."

So, for example, maybe you had a DNA result that came and had a witness take the stand and testify, "I observed that, reviewed the analysis. It matches Mr. Harrison."

"The term 'circumstantial evidence' refers to evidence from which, based on your common sense and experience, you may reasonably infer something that is at issue in this case."

The judge is telling you you do not need that DNA. Based on your common sense and experience, you may reasonably infer something at issue in this case.

The prosecutor went on to discuss some of the most convincing aspects of the evidence, such as the fact that Harrison matched the victims' description of the second suspect and was found shortly after the robbery at the same location as Morcom's cell phone and a firearm. The prosecutor continued:

The judge is telling you that circumstantial evidence, that from which you may use your common sense and infer something at issue in this case. You can infer that he was in that room. It was him. And the judge tells you the law does not distinguish between direct and circumstantial evidence in terms of their weight or value.

The weight of the DNA is the same as the weight of the circumstantial evidence that you use your common sense to infer. The judge has told you that. One is not more—one is not necessarily more or less valuable that the other.

Instruction number 5. Read that so that when you go back there and you say, well, there's no DNA for this stuff, can I reasonably infer, using my common sense, what I know happened here based on the facts? Yes. The judge has told you that you can.

Evidence is either direct or circumstantial. In the eyes of the law, they are equal. And sometimes there are situations where circumstantial evidence may even be more reliable than direct evidence. Direct evidence is something observed by someone perceiving something.

The prosecutor provided a lengthy hypothetical about tracks in the snow to illustrate circumstances in which circumstantial evidence would be more persuasive than direct evidence. The State closed by arguing that Harrison was guilty because in this case, "the tracks lead from the motel room to Ryan Kelley's house."

To prevail on a claim of prosecutorial misconduct, Harrison must show that the prosecutor's conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). But where, as here, a defendant fails to object, he is deemed to have waived any error unless the reviewing court can determine that (1) no curative instruction could have cured the resulting prejudice and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. Emery, 174 Wn.2d at 761. An objection is not necessary in cases of incurable prejudice because it is effectively a mistrial and a new trial is the only and the mandatory remedy. Emery, 174 Wn.2d at 762. When reviewing a prosecutor's misconduct that was not objected to, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Emery, 174 Wn.2d at 762.

The prosecutor's theme that the "judge is telling you" that DNA evidence is not necessary was improper. This theme should be removed unconditionally from the State's arsenal of rhetoric. The argument not-so-subtly insinuated that the trial judge was an ally of the State. The

prosecutor should have kept the argument focused on the specific instructions rather than bringing the judge into it. However, allegedly improper comments must be reviewed in the context of the entire argument, not in isolation. State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). In context, as the jury more likely understood it, the prosecutor's point was that the law as set forth in the instructions does not require DNA, or any other specific type of evidence, and it does not distinguish between circumstantial and direct evidence in terms of weight or value.

Significantly, the prosecutor's remarks were curable. For instance, in Emery, the prosecutor committed misconduct through a "fill in the blank" argument which the court held could potentially have confused the jury about its role and the burden of proof. Emery, 174 Wn.2d at 759. Nonetheless, the Supreme Court held that the misconduct did not require reversal because

> the misstatements here could have been cured by a proper instruction. If either [defendant] had objected at trial, the court could have properly explained the jury's role and reiterated that the State bears the burden of proof and the defendant bears no burden.

Emery, 174 Wn.2d at 764.

This reasoning applies equally here. At the outset of the case, the trial court explained to the jury that the court was prohibited from commenting on the evidence:

> The law does not permit a judge to comment on the evidence, and I will not intentionally do so.

12

By a comment on the evidence, I mean some expression or indication from me as to my opinion on the value of the evidence or the weight of it. If it appears that I do comment on the evidence, you are to disregard such apparent comment entirely.

The court's written instructions likewise provided:

The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

....

Our state constitution prohibits a trial judge from making a comment on the evidence. It would be improper for me to express, by words or conduct, my personal opinion about the value of testimony or other evidence. I have not intentionally done this. If it appeared to you that I have indicated my personal opinion in any way, either during trial or in giving these instructions, you must disregard this entirely.

Had Harrison objected, the trial court could have sustained the objection, reiterated these instructions, and instructed the jury to disregard the improper remarks. Because the remarks were not incurably prejudicial, reversal is not warranted.

We also reject Harrison's effort to overcome his lack of objection to the prosecutor's improper remarks by recharacterizing the issue as whether defense counsel provided ineffective assistance by failing to object. He has not shown that prosecutorial misconduct implicates the ineffective assistance of counsel doctrine. See State v. Fisher, 165 Wn.2d 727, 757 n.8, 202 P.3d 937 (2009). Review under the standards for prosecutorial misconduct is sufficient to determine whether the prosecutor's remarks warrant reversal.

Affirmed.

Becker, J.

WE CONCUR:

Trickey, A.C.J.                    Dwyer, J.