# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) | No. 68568-6-I |
| v. | ) | |
| JONATHAN WELLS BRADFORD, | ) | PUBLISHED OPINION |
| Appellant. | ) | FILED: August 12, 2013 |

DWYER, J. — A jury found Jonathan Bradford guilty of several offenses, including the felony stalking of Vanida Vilayphone. Pursuant to RCW 9A.46.110, a person is guilty of stalking if, *inter alia*, he or she "repeatedly harasses" another person. The stalking statute's delineation of the term, "harasses," incorporates the phrase, "course of conduct," as set forth in RCW 10.14.020(1). The plain language of the definition of this term explicitly excludes from its scope constitutionally protected free speech activities. Accordingly, contrary to Bradford's contention, the stalking statute's harassment provision does not criminalize constitutionally protected free speech activities and, thus, is not unconstitutionally overbroad on its face.

Bradford further contends that the stalking statute is unconstitutionally vague because that which might be excluded from its purview as constituting

constitutionally protected free speech activities can be difficult to discern and subject to debate amongst the legally-trained. Close analysis of this claim reveals that it is, put mildly, silly. Also unavailing is Bradford's contention that the trial court erred in admitting certain evidence of his harassing activities. We affirm.

I

Vilayphone met Bradford in early 2007 through her friend, Rose Smith. Although Vilayphone was married to Ron Mason, she and Bradford developed a romantic relationship toward the end of 2007. By the middle of 2009, Vilayphone decided to end her affair with Bradford. Bradford, however, rejected Vilayphone's repeated attempts to end their relationship.

Bradford did not have Vilayphone's cellular telephone number. Thus, in order to contact her, he began telephoning her at her place of employment several times a day. He would also appear at her work twice each week. In October 2010, Vilayphone quit her job because of Bradford's unrelenting efforts to contact her there.

Bradford additionally attempted to communicate with Vilayphone through her friend, Smith, whose cellular telephone number he had acquired. In November 2009, Bradford began to send Smith text messages, and continued to do so throughout 2010. Smith would forward these messages to Vilayphone. Some of the text messages that Bradford sent to Smith during this time warned that, if Vilayphone did not call him, he would harm himself or others. The messages also included threats to distribute to neighbors and family members a

sex video of Vilayphone and Bradford. In May 2010, a copy of the sex video was placed on Vilayphone's husband's car.

In addition, Bradford appeared outside of Vilayphone's house almost every day in 2010. He would drive around the block on which her house was located, honk his car's horn, and park outside of her house.

On December 5, 2010, copies of the sex video were left on several cars in Vilayphone's neighborhood. A handwritten note with Vilayphone's name and address was included in each envelope that contained the video. On December 30, 2010, Vilayphone obtained an antiharassment protection order against Bradford. Nevertheless, Bradford continued to drive by and around Vilayphone's house.

Bradford also continued to send text messages to Smith throughout January 2011. On January 10, 2011, Smith forwarded to Vilayphone messages that stated: "Have Vanida call me, please"; "I know she's with you, and all I am asking for her is to call me. I need to tell her a few things before it's all over"; and, "Would you please ask Vanida to call me. I really need to talk to her before it's toooooooo late."

On January 15, 2011, Vilayphone received another forwarded text message from Smith, which read: "By the way, the video is getting distributed to [her] neighbors." On January 16, 2011, Smith forwarded the following text messages to Vilayphone: "Have Vanida check her Yahoo account"; "Have Vanida give me a call, please. It is a life or death emergency. I know you have

been passing my messages to her, so you can pass this"; "I said it was life or death. Well, booooooommmmmmmm!!!!"; and, "Smell gas? So do I."

Upon receiving the various text messages from Smith, Vilayphone would invariably call 911, and did so on several occasions during the month of January. Officer Vasilios Sideris responded to many of these calls. As part of each investigation, Vilayphone would show Officer Sideris the forwarded text message displayed on her cellular telephone. Officer Sideris would record each text message verbatim into his notebook, from which he would subsequently copy the entries verbatim into a police report. At trial, Officer Sideris read the January 2011 text messages aloud, quoting directly from the police reports.[1]

On January 20, 2011, Vilayphone discovered a suspicious package outside of her front door. The sender's information indicated that it was from Bradford. She called 911 and the police responded. After performing an x-ray examination of the package, the police opened the package and found a bottle of wine and a letter.

Two days later, Bradford was arrested after police officers observed him driving past Vilayphone's house. On April 12, 2011, Bradford pleaded guilty in Seattle Municipal Court to two counts of violation of the December 2010 antiharassment protection order, premised upon Bradford's contact with Vilayphone through a third party. He also pleaded guilty to one count of stalking Vilayphone.

---

[1] After finding that there was sufficient proof of authentication regarding the January 2011 text messages, the trial court admitted six of them, thereby permitting Officer Sideris to read them into the record. The police reports themselves were not admitted into evidence.

A domestic violence no-contact order was entered on April 12, 2011. The order prohibited Bradford from contacting Vilayphone and was effective until April 12, 2016.[2] That same day, a second no-contact order was entered, prohibiting Bradford from contacting Smith until April 12, 2016.

On June 17, 2011, shortly after his release from jail, Bradford appeared at a restaurant in which Vilayphone was sitting. According to Vilayphone, he left the restaurant once he saw her there. One week later, Bradford located Vilayphone at that same restaurant, approached her, and professed his love for her. He left the restaurant after Vilayphone threatened to call the police.

Shortly thereafter, Bradford once again began to send text messages to Smith. Vilayphone contacted the police upon receiving these text messages forwarded from Smith. The police conducted a "phone dump" of Smith's cellular telephone.[3] This procedure generated a 280-page report itemizing each text message that Smith's cellular telephone sent or received during a several-month period. The trial court admitted into evidence a 12-page condensed version of this report, which displayed each text message that Smith's cellular telephone had sent or received between June 26 and July 10, 2011. Included within this examination report were 25 relevant text messages received by Smith:

1. "Don't worry I will settle all of it in the next day or so! Thank you and yave [sic] a good night." June 28, 2011.

---

[2] The order prohibited Bradford from coming within 500 feet of Vilayphone and from contacting her "directly or indirectly by text messages, instant messages, electronic mail, voice mail, Internet phone service, website communications or postings."

[3] At trial, a police officer involved in the investigation testified that a "phone dump" is a method used by investigators to retrieve messages that are sent to and from a cellular telephone.

2. "Rons going to know that she went to his house instead of yours you know that right? It isn't that hard to figure out." June 28, 2011.

3. "It has always been a shame with her and you. Its a sad twist of affairs and it shouldn't have been. She was never honest with me, him or any body." June 28, 2011.

4. "You need to guess who this is and yes it is the truth about her and the karma bartender. We all three know that's the truth." June 28, 2011.

5. "Who? And why am I doing this? Answer the first question and I will answer the second. Ok then have her meet me at gasworks to talk about things." June 28, 2011.

6. "Hello??????" June 28, 2011.

7. "I need an answer." June 28, 2011.

8. "Why is she doing this? I need an answer." June 28, 2011.

9. "Hello? I need a reply." June 28, 2011.

10. "I just want to let everyone know that I am not mad and that I am sorry for everything that happened. I didn't know that I was making everyone scared." June 30, 2011.

11. "I am not mad at anyone and I am sorry for all the stress I caused. By doing what she did she destroyed my life. I just need to correct things." July 2, 2011.

12. "I never hurt anyone or ever would so I don't understand why she did what she did or wouldn't try to help me because that is all I asked for." July 2, 2011.

13. "I know that she is seeing the bartender from karma and that is said because she was seeing him before we broke up." July 2, 2011.

14. "She used it to have me put where she did and all I asked for is honesty. I, you and she know the truth and she should tell ron." July 2, 2011.

15. "Last chance go reply." July 5, 2011.

16. ";)- no other chance than today!" July 5, 2011.

17. "Sorry but its true." July 5, 2011.

18. "Done did done. I told you its her and you I would sent it to her family!" July 5, 2011.

19. "It is sad that she let it get to this without talking things out. Her family gets the video by Wednesday. She still can call n work things out." July 5, 2011.

20. "I need to talk." July 6, 2011.

21. "She needs to call me tonight." July 6, 2011

22. "So are you going to have her call me? I am sure that she shouldn't be that hard to get a hold of to ask, right?" July 8, 2011.

23. "I guess the question should be renton or seatac?" July 8, 2011.

24. "I thought I asked her to call and I am still waiting. I really don't want to have to go to the next step. I am trying to be nice n make things right." July 9, 2011.

25. "She should call me tonight. Like now." July 10, 2011.

The report did not identify the sender's identity, as it did with other text messages from Smith's known contacts. After the police produced the examination report, Smith identified the 25 messages as those which she believed had been sent by Bradford.

On July 23, 2011, Bradford was arrested after he rammed his automobile into Vilayphone's husband's car (while he was inside of it) and, thereafter, collided with a police officer's patrol vehicle while fleeing the scene of the first collision.

Subsequently, a jury found Bradford guilty of the following offenses: (1) felony stalking (domestic violence) of Vilayphone; (2) domestic violence misdemeanor violation of the April 2011 court order protecting Vilayphone; (3) felony stalking of Smith; (4) violation of the April 2011 antiharassment order protecting Smith;[4] (5) driving while under the influence; (6) hit and run; and (7) reckless endangerment.

Bradford appeals.

---

[4] The charging period for offenses (1) through (4) listed herein was between June 17 and July 23, 2011. The other 3 offenses were alleged to have been committed on July 23.

- 7 -

II

Bradford first contends that the harassment provision of the stalking statute, RCW 9A.46.110(1)(a), proscribes constitutionally protected speech and, thus, is facially overbroad. We disagree. The statutory scheme, by its express terms and structure, does not seek to regulate constitutionally protected free speech activities. It is constitutionally sound.

We review de novo a trial court's interpretation of constitutional provisions and legislative enactments. State v. Immelt, 173 Wn.2d 1, 6, 267 P.3d 305 (2011). Generally, legislative enactments are presumed to be constitutional. Immelt, 173 Wn.2d at 6. An overbreadth challenge premised on the state constitution[5] is analyzed in the same manner as when such a challenge is grounded in the First Amendment. Bradburn v. N. Cent. Reg'l Library Dist., 168 Wn.2d 789, 804, 231 P.3d 166 (2010).

"A law is overbroad if it sweeps within its prohibitions constitutionally protected free speech activities." City of Seattle v. Huff, 111 Wn.2d 923, 925, 767 P.2d 572 (1989). However, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 800, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984). Moreover, "[a] statute regulating behavior and not pure speech will not be overturned unless the overbreadth is both real and substantial in relation to

---

[5] Article I, section 5 of the Washington State Constitution provides: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."

the statute's legitimate sweep." State v. Lee, 135 Wn.2d 369, 388, 957 P.2d 741 (1998) (citing Broadrick v. Oklahama, 413 U.S. 601, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)).

Thus, we must first determine whether the challenged enactment criminalizes constitutionally protected activity. City of Tacoma v. Luvene, 118 Wn.2d 826, 841, 827 P.2d 1374 (1992). If the statute does criminalize some constitutionally protected conduct, we must next ask whether the statute prohibits a "real and substantial" amount of protected conduct in relation to the statute's plainly legitimate sweep. Luvene, 118 Wn.2d at 840 (internal quotation marks omitted) (quoting City of Seattle v. Webster, 115 Wn.2d 635, 641, 802 P.2d 1333 (1990)). A statute "will be overturned only if the court is unable to place a sufficiently limiting construction on a standardless sweep of legislation." Luvene, 118 Wn.2d at 840.

The challenged provision of the stalking statute, RCW 9A.46.110(1)(a), provides, in relevant part:

(1) A person commits the crime of stalking if, without lawful authority and under circumstances not amounting to a felony attempt of another crime:

(a) He or she intentionally and repeatedly harasses or repeatedly follows another person.[6]

---

[6] The remainder of RCW 9A.46.110(1) states:

(b) The person being harassed or followed is placed in fear that the stalker intends to injure the person, another person, or property of the person or of another person. The feeling of fear must be one that a reasonable person in the same situation would experience under all the circumstances; and

(c) The stalker either:

(i) Intends to frighten, intimidate, or harass the person; or

(ii) Knows or reasonably should know that the person is afraid, intimidated, or harassed even if the stalker did not intend to place the person in fear or intimidate or harass the person.

Pursuant to RCW 9A.46.110(6)(c), "'[h]arasses' means unlawful harassment as defined in RCW 10.14.020," which, in turn, provides:

> (1) "Course of conduct" means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. "Course of conduct" includes, in addition to any other form of communication, contact, or conduct, the sending of an electronic communication, *but does not include constitutionally protected free speech. Constitutionally protected activity is not included within the meaning of "course of conduct."*
>
> (2) "Unlawful harassment" means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress to the petitioner, or, when the course of conduct would cause a reasonable parent to fear for the well-being of their child.

RCW 10.14.020 (emphasis added).

As an initial matter, Bradford contends that the legislature, when enacting the stalking statute, did not intend for the definition of "course of conduct," as set forth in RCW 10.14.020(1), to be applied to the statute. This is so, he asserts, because "well-settled principles of statutory interpretation prohibit a court from adding words to a statute that the Legislature has chosen not to include."

Bradford's assertion is in contravention to the statutory scheme's clear delineation of the term, "harasses." It also ignores previous Washington Supreme Court decisions that have applied the cited definition of "course of conduct" to the stalking statute. See State v. Kintz, 169 Wn.2d 537, 545-56, 238 P.3d 470 (2010); State v. Becklin, 163 Wn.2d 519, 527-28, 182 P.3d 944 (2008);

- 10 -

see also State v. Haines, 151 Wn. App. 428, 434, 213 P.3d 602 (2009). Bradford does not convincingly explain why we should not follow this decisional authority. Therefore, in analyzing the meaning and scope of "harasses," we will apply to the stalking statute the definition of "course of conduct" set forth in RCW 10.14.020(1).

By so doing, it becomes obvious that the stalking statute's proscriptions do not intrude upon constitutionally protected activities because the plain language of the definition of the term "course of conduct" explicitly excludes from its scope such activities. The text of RCW 10.14.020(1) expressly declares that "'[c]ourse of conduct' . . . does not include constitutionally protected free speech. Constitutionally protected activity is not included within the meaning of 'course of conduct.'" Thus, the stalking statute explicitly does not criminalize actions—"a course of conduct"—that are constitutionally protected.[7]

In defining the term, "harasses," the stalking statute incorporates the definition of "course of conduct" set forth in RCW 10.14.020(1). That language specifically excepts from its reach constitutionally protected free speech activity. Therefore, Bradford's facial overbreadth challenge to the stalking statute fails.

---

[7] By excluding constitutionally protected activities from its purview, the challenged statute also renders evidence of such activities inadmissible. Because evidence of constitutionally protected activities cannot form a basis for a conviction, such evidence is irrelevant and, thus, inadmissible. Hence, in the courtroom, questions concerning the interplay between the stalking statute and constitutionally protected activities are, in essence, questions of evidentiary admissibility, not questions of statutory validity.

III

Bradford next contends that RCW 9A.46.110(1) is unconstitutionally vague on its face because, he asserts, the statutory definition of "course of conduct" contains phrases that leave ordinary citizens to speculate as to what conduct is proscribed. We disagree.

"A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process. To succeed, however, the complainant must demonstrate that the law is impermissibly vague in all of its applications." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982). "A vagueness challenge seeks to vindicate two principles of due process: the need to define prohibited conduct with sufficient specificity to put citizens on notice of what conduct they must avoid, and the need to prevent arbitrary and discriminatory law enforcement." Lee, 135 Wn.2d at 393 (citing Luvene, 118 Wn.2d at 844). A statute violates the due process clause if it (1) "does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed" or (2) "does not provide ascertainable standards of guilt to protect against arbitrary enforcement." City of Spokane v. Douglass, 115 Wn.2d 171, 178, 795 P.2d 693 (1990).

Our courts do not apply the void for vagueness doctrine casually; rather, we "approach a vagueness challenge with a strong presumption in favor of the statute's validity." State v. Smith, 111 Wn.2d 1, 5, 759 P.2d 372 (1998). Merely

because some terms in a statute are undefined does not mean that the statute is unconstitutionally vague. Lee, 135 Wn.2d at 393 (citing Douglass, 115 Wn.2d at 177). The party asserting a vagueness challenge bears the heavy burden of establishing that the legislative enactment is unconstitutionally vague beyond a reasonable doubt. State v. Maciolek, 101 Wn.2d 259, 263-64, 676 P.2d 996 (1984).

Here, Bradford contends that the phrases, "constitutionally protected free speech" and "constitutionally protected activity," contained in the definition of "course of conduct," as set forth in RCW 10.14.020(1), render the stalking statute void for vagueness. This is so, Bradford maintains, because that which is considered speech protected by the First Amendment has been the "subject of considerable litigation and scholarly debate since [the First Amendment's] ratification."

Put plainly, Bradford's argument is nonsensical. In essence, his contention is that the concept of "constitutionally protected" activities is beyond the ken of ordinary citizens. Were we to accept Bradford's assertion, *all* criminal statutes would be void for vagueness. This is so because *every* statute— whether implicitly or explicitly stated—is subject to constitutional limitations. Simply put, Bradford posits the following: (1) constitutional analysis can be hard; (2) constitutional limitations apply to all statutes; (3) it is hard to analyze the scope of these limitations; (4) therefore, all statutes are unconstitutionally vague. This is not a winning argument.

Indeed, "[p]resumptively available to all citizens are the statements of law contained in statutes and in court rulings." Smith, 111 Wn.2d at 7 (holding that former RCW 9A.46.020 is not unconstitutionally vague because readily ascertainable sources of law provide meaning to the phrase "lawful authority" as it appears in the statute). Hence, ascertainable standards exist to inform the public as to what type of conduct is constitutionally unprotected and, thus, proscribed by the stalking statute. A litany of United States Supreme Court and Washington Supreme Court decisions has interpreted the scope of the First Amendment's free speech protections in similar instances. See e.g., Virginia v. Black, 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003); R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992); Brandenburg v. Ohio, 395 U.S. 444, 89 S. Ct. 1827, 23 L.Ed 2d 430 (1969); United States v. O'Brien, 391 U.S. 367, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968); Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S. Ct. 766, 86 L.Ed.2d 1031 (1942); Immelt, 173 Wn.2d 1; State v. Williams, 144 Wn.2d 197, 26 P.3d 890 (2001); City of Seattle v. Eze, 111 Wn.2d 22, 759 P.2d 366 (1988).

Bradford fails to carry his burden of proving that the stalking statute is unconstitutionally vague beyond a reasonable doubt. Accordingly, his claim fails.

IV

Finally, Bradford contends that the trial court erroneously admitted evidence of text messages sent to Smith's cellular telephone because, he asserts, such messages were not sufficiently identified or authenticated, as required by ER 901(a). Again, we disagree.

- 14 -

A court's admission of evidence is reviewed for abuse of discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). Abuse of discretion occurs when a trial court's decision is manifestly unreasonable or based on untenable grounds. Magers, 164 Wn.2d at 181.

Pursuant to ER 901(a), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This requirement is met "if sufficient proof is introduced to permit a reasonable trier of fact to find in favor of authentication or identification." State v. Danielson, 37 Wn. App. 469, 471, 681 P.2d 260 (1984). Furthermore, the trial court is not bound by the rules of evidence when making a determination as to authenticity. State v. Williams, 136 Wn. App. 486, 500, 150 P.3d 111 (2007) (citing ER 104(a); ER 1101(c)(1); Danielson, 37 Wn. App at 471).

Here, the trial court admitted Officer Sidaris's testimony, in which he read to the jury the text messages received by Vilayphone in January 2011. The court also admitted as an exhibit the 12-page examination report of Smith's cellular telephone, which included the text messages that Smith received between June and July 2011. Bradford contends that this evidence was not sufficiently authenticated because, he asserts, the State did not prove that he was the individual responsible for sending these text messages.[8]

---

[8] On appeal, Bradford additionally asserts that the State failed to prove that the device used during the "phone dump" was "in proper working order." In so contending, he relies on ER 901(b)(9), which provides that, as an example of authentication, a proponent may present "[e]vidence describing a process or system used to produce a result and showing that the

Sufficient evidence was introduced to support a finding that the text messages that were read to the jury and contained in the 12-page examination report were what the State purported them to be: text messages written and sent by Bradford. For a substantial period of time, Bradford telephoned Vilayphone and appeared at her place of employment on a frequent basis. He also regularly appeared outside of her house. These actions demonstrated Bradford's desperate desire to communicate with Vilayphone. It was consistent with this obsessive behavior that he would also send text messages to Smith as part of his efforts to contact Vilayphone.

In addition, the content of the text messages themselves indicated that Bradford was the individual who sent them. For example, the January 2011 text messages repeatedly mentioned Vilayphone's name, demanding that Smith have Vilayphone call the sender. Furthermore, the threats contained in the January 2011 messages regarding the sex video were similar to Bradford's previous threats made in 2010. In January 2011, Smith received a text message warning that "the video is getting distributed to the neighbors." This text message was preceded by an incident in December 2010, in which copies of the sex video were placed on several cars in Vilayphone's neighborhood. In addition, in 2010, Smith received text messages with similar threats to distribute the video to family

process or system produces an accurate result." However, at trial, Bradford did not object to the admission of the text messages on this specific basis. Nor did he raise this issue in his briefings to the trial court. Instead, Bradford's authentication objections were grounded on the asserted lack of sufficient evidence establishing that he was the individual responsible for sending the text messages. "A party may assign evidentiary error on appeal only on a specific ground made at trial." State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007); accord ER 103(a)(1). Bradford did not raise this issue in the trial court and, thus, did not properly preserve this challenge for appeal.

members and neighbors and, subsequently, a copy of the video was found on Vilayphone's husband's car. These January 2011 threats to distribute the video were consistent with Bradford's previous threats made in 2010. They also comported with Bradford's obsessive behavior at that time.

Furthermore, two of the text messages sent to Smith in January 2011 threatened to cause an explosion. They stated: "I said it was life or death. Well, boooooommmmmmmm!!!!"; and, "Smell gas? So do I." Shortly after these messages were sent, Vilayphone received a suspicious package from Bradford.

Also pertinent was the fact that, between January 22 and May 23, 2011, Bradford was in jail and, therefore, unable to send text messages or emails. During this same time period, Smith did not receive any offensive text messages. Once Bradford was released from jail, however, he located Vilayphone in person at a restaurant. Thereafter, Smith began, once again, to receive offensive text messages, which she believed were from Bradford. The content of two of the messages referred to Vilayphone's husband, Mason. Two of the messages referenced the name of the restaurant in which Bradford had seen Vilayphone. Finally, Smith and Vilayphone testified to their belief that the text messages were from Bradford.

There was no trial court error in the admission of the challenged evidence. The State properly authenticated the evidence of Bradford's text messages pursuant to ER 901(a).[9]

---

[9] Bradford asserts several claims in a separate statement of additional grounds. He asserts: (1) multiple violations of the right to due process; (2) a violation of the Sixth

- 17 -

Affirmed.

We concur:

---

Amendment's Confrontation Clause; (3) prosecutorial misconduct; (4) that several witnesses committed perjury; and (5) a violation of the Sixth Amendment right to counsel. Several of Bradford's contentions are incoherent. However, insofar as some of his arguments are comprehensible, they nevertheless fail to have any basis in the law or facts. Accordingly, each of Bradford's contentions is without merit.