FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2019 FEB -5 AM 11: 29

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>VANDAD BARZIN RAD,<br><br>Appellant. | No. 77605-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: February 5, 2019 |

APPELWICK, C.J. — A jury found Rad guilty of felony stalking. Rad argues that the trial court erred in admitting screen shots of social media messages into evidence, because the State failed to properly authenticate them. We affirm.

## FACTS

In February 2015, Diane Wright connected with Vandad Rad on Tinder, a dating app for cell phones. The two exchanged phone numbers and went on a date. About a month later, Wright received a friend request[1] on Facebook from Rad. Wright texted Rad, and the two went on another date. After their second date, they decided to be friends.

Rad and Wright saw each other two or three more times. While "hanging out" in April 2015, Rad gave Wright a marijuana soda, which made her feel sick after drinking it. Rad then performed oral sex on her, even though she told him to

---

[1] A "friend request" is a way of connecting two different Facebook accounts. Wright had used Facebook's privacy settings so that only her profile picture, her name, and the city she lived in could be seen by accounts not connected to her account.

stop. The next day, Wright texted Rad and told him that she never wanted to see him again, to not contact her again, and to leave her alone.

Rad then reached out to Wright through Facebook, and told her that she was overreacting. She responded and told Rad not to contact her again. After a few more messages, Wright again told Rad to leave her alone and blocked[2] him, so that he could no longer message her on Facebook. In June, Wright received a text message from a phone number she did not recognize that claimed to be from Rad. After receiving another text message from the same number in August, Wright blocked both that number and the other phone number she had for Rad.

Between September 2015 and February 2016, Wright received five or six friend requests on Facebook from accounts that displayed Rad's name and picture. She did not accept the requests. In March 2016, Wright's friend, an attorney, sent Rad a letter stating that if he continued contacting Wright, they would file for a protection order. In May, an account with Rad's name sent a Facebook message to Wright's father. In the message, the sender asked Wright's father for advice on how to reconnect with her. Wright also received Facebook messages from an account named "Vondod Pwrsyrs." The sender, who Wright understood to be Rad, stated that he was "enamored, obsessed, and addicted."

Wright then sought a protection order against Rad in Pierce County, where she was then living. She was granted a two week temporary protection order, lasting until June 10. On June 6, Rad showed up at Wright's door. She called 911

_____

[2] When a Facebook user blocks another account, the blocked account can no longer find that user's account, send that user a friend request, or see that user's profile.

2

and police arrested Rad. Four days later, a judge granted Wright a protection order against Rad.

In December, Wright again received messages she believed were from Rad. She received the messages on various social media platforms, including Snapchat,[3] Instagram,[4] Facebook, and Skype.[5] She told police about them.

On December 29, 2016, the State charged Rad with one count of domestic violence felony stalking. Prior to trial, Rad moved to exclude the social media evidence in this case. The trial court determined that "screen shots of social media or other electronic communications" would be admissible if sufficient evidence was presented "to establish relevance and that they are what they purport to be." At trial, screen shots of Rad's alleged attempts to contact Wright in December 2016 were depicted in exhibits five, six, seven, eight, and nine. The trial court admitted into evidence exhibits five through nine over Rad's objections. In closing argument, the State relied on the December messages to prove that Rad committed the charged crime.

A jury found Rad guilty of felony stalking, but did not find domestic violence. Rad appeals.

## DISCUSSION

Rad argues that the trial court failed to require sufficient authentication before admitting exhibits five through nine into evidence. He argues that there was

---

[3] "Snapchat" is a cell phone app similar to text messaging except that the photos and texts sent through Snapchat disappear once they are seen by the recipient and are not preserved.

[4] "Instagram" is a social media platform for sharing photographs.

[5] "Skype" is a live video chat and long-distance voice calling service.

insufficient corroboration to conclude that he sent the social media messages, because the State presented only his name in some of the exhibits and his picture in others. He asserts that Wright's testimony that the messages were from him was based on speculation. And, he asserts that "none of [the messages] contained distinctive content," and "none were corroborated by other events or with forensic computer evidence."

This court reviews a trial court's admission of evidence for an abuse of discretion. State v. Bradford, 175 Wn. App. 912, 927, 308 P.3d 736 (2013). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. Id.

Under ER 901(a), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This requirement is met "if sufficient proof is introduced to permit a reasonable trier of fact to find in favor of authentication or identification." State v. Danielson, 37 Wn. App. 469, 471-72, 681 P.2d 260 (1984). When making a determination as to authenticity, the trial court is not bound by the rules of evidence. Bradford, 175 Wn. App. at 928. "A trial court may, therefore, rely upon . . . lay opinions, hearsay, or the proffered evidence itself in making its determination." State v. Williams, 136 Wn. App. 486, 500, 150 P.3d 111 (2007). The information must be reliable, but it need not be admissible. Id.

ER 901(b) provides examples of authentication that conform to the requirement in ER 901(a). These examples are "[b]y way of illustration only, and

4

not by way of limitation." ER 901(b). ER 901(b) does not specifically address social media messages. But, it does address methods for authenticating e-mails:

> Testimony by a person with knowledge that (i) the e-mail purports to be authored or created by the particular sender or the sender's agent; (ii) the e-mail purports to be sent from an e-mail address associated with the particular sender or the sender's agent; and (iii) the appearance, contents, substance, internal patterns, or other distinctive characteristics of the e-mail, taken in conjunction with the circumstances, are sufficient to support a finding that the e-mail in question is what the proponent claims.

ER 901(b)(10).

Rad argues that courts "have imposed a heavier burden of authentication on messaging and social network postings because of the increased dangers of falsehood and fraud." He cites case law from other states to support this argument. Rad also argues that for "electronic communication like text messaging, Washington has followed the heightened requirements for authentication" He relies on Bradford and In re Detention of H.N., 188 Wn. App. 744, 355 P.3d 294 (2015).

In Bradford, another felony stalking case, the defendant did not have the victim's phone number and sent text messages to the victim's friend, Smith, who would forward the messages to the victim. 175 Wn. App. at 915-16, 919. This court held that, under ER 901(a), there was sufficient evidence to support a finding that text messages Smith received were written and sent by Bradford. Id. at 919, 928-29. First, Bradford sending the messages was consistent with his "desperate desire" to communicate with the victim. Id. at 929. Second, the content of the messages, for example, repeatedly mentioning the victim's name and demanding

5

that she call the sender, indicated that Bradford sent them. Id. Third, when Bradford was in jail, Smith did not receive any messages. Id. at 929-30. But, once he was released, Smith started receiving messages again. Id. at 930. Finally, Smith and the victim testified that they believed the messages were from Bradford. Id. This court did not apply heightened requirements for authenticating the messages. See id. at 928.

In H.N., this court held that, under ER 901(b), the State properly authenticated e-mailed screen shots of text messages read into the record by the State's expert witness. 188 Wn. App. at 748, 750, 759. First, there was testimony that H.N. acknowledged sending the messages. Id. at 758. Second, the sender's phone number matched H.N.'s contact information in her medical chart, and H.N.'s full name was displayed as the sender. Id. Third, the content of the messages, which referenced names of people in H.N.'s life, suggested H.N. was the sender. Id. Fourth, the messages were consistent with certain events in H.N.'s life. Id. Finally, the timing of the messages was consistent with H.N.'s hospitalization on the night her roommates found her unconscious. Id. at 758-59.

This court concluded that "[i]n sum, the requirements of ER 901(b)(10) are satisfied by analogy." Id. at 759. It noted that ER 901(b) does not specifically address text messages, but that the rule's examples provided proper bases for its determination. Id. at 752. Comparing ER 901(b)(10)'s treatment of e-mails to the text messages at issue, this court found that (1) the record established that the text messages were authored by H.N., (2) they were sent from the cell phone number associated with H.N., and (3) the distinctive characteristics of the messages, in

conjunction with the circumstances, were sufficient to support authentication. Id. at 759. Like Bradford, this court did not apply heightened requirements for authenticating the messages. See id. at 751.

Here, the State introduced a number of exhibits showing Rad's attempts to contact Wright in December 2016. Exhibit five shows a request from "Vandad," also listed as "vandude83," to connect with Wright on Snapchat. Exhibit six shows requests from "Vandad Rad (@van44444)" to send Wright a message and "follow" her on Instagram.[6] The Instagram account sent Wright a street address, which Wright recognized as Rad's address. And, the picture associated with the account was a picture of Rad.

Exhibit seven shows another request to follow Wright on Instagram, this time from "Vandad Rad (@vandad._rad)." The picture associated with the account was a picture of Rad. Wright also received several messages from the account. The messages included a picture of Rad, and a picture of a global positioning system (GPS) in a car showing the car's location. Wright testified that the GPS indicator was "very close" to the school where she worked. The GPS picture was accompanied by messages that stated, "It's about 20 minutes [sic] drive right on home," and, "Let me know if I can take you home, please." She received more messages from the account the next day, stating, "You win," "I'll stop bothering you," "Have a great life," and "Ima [sic] keep tryin [sic]. . . . I guess the judge can send me to jail on 4th [sic] of January."

---

[6] An Instagram user has to request to send another user a message if that other user has not allowed them to follow their account.

Exhibit 8 shows a friend request Wright received on Facebook from "Banlino Barz." The same account tried calling Wright through Facebook, and sent her messages stating, "This is Vandad Barzin Rad," and "12 days before Christmas, I don't know what gift to buy you yet."

Finally, exhibit 9 shows a contact request Wright received on Skype from "Vandad Rad," also listed as "live:vrad132333" and "snowangel." The same account also tried calling Wright through Skype.

Unlike H.N., Rad did not acknowledge sending Wright the December messages. But, like Bradford and H.N., the content of the messages indicated that Rad was the sender. All but one of the accounts that tried to contact Wright listed "Vandad" or "Vandad Rad" as the sender. The one account named "Banlino Barz" sent Wright a message stating, "This is Vandad Barzin Rad." Wright received Rad's address from the Instagram account named "Vandad Rad." The other Instagram account named "Vandad Rad" sent Wright a picture of GPS coordinates near her workplace, asked if she wanted a ride home, said he would stop bothering her, but then said he would "keep tryin [sic]." The Facebook account named "Banlino Barz" sent Wright a message stating that he did not know what to buy her for Christmas.

This content, and the repeated attempts to connect with Wright on social media, comport with evidence of Rad's past obsessive behavior. Prior to December, Wright received five or six Facebook friend requests from accounts with Rad's name, and a Facebook message she understood to be from Rad, stating he was "obsessed" and "addicted." Wright's father received a Facebook

8

message from an account with Rad's name, asking how he could reconnect with Wright. And, Rad showed up at Wright's door after she was granted a temporary protection order against him.

Also, like H.N., one of the Instagram messages was consistent with events happening in Rad's life. The message stated, "Ima [sic] keep tryin [sic] . . . . I guess the judge can send me to jail on 4th [sic] of January." Rad had a court date on January 4. And, the statement "the judge can send me to jail" indicates that the sender knew he was not allowed to contact Wright. Last, like Bradford, Wright testified to her belief that the December 2016 messages in exhibits five through nine were from Rad.

Based on this evidence, a reasonable trier of fact could find that the December 2016 messages were what they purported to be, messages written and sent by Rad. Therefore, the State properly authenticated the messages. Rad's challenge to the admissibility of the messages is based solely on authentication. Accordingly, the trial court did not abuse its discretion in admitting exhibits five through nine into evidence.

We affirm.

Appelwick, C.J.

WE CONCUR:

Chun, J.                           Dwyer, J.

9