THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ANDREW GILLESPIE AND KATHERINE WARD, | ) ) ) | No. 82452-0-I |
| Respondents, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| PAUL DRINKWINE, | ) ) | |
| Appellant. | ) ) | |

ANDRUS, C.J. – Paul Drinkwine appeals an anti-harassment protection order prohibiting him from having any contact with neighbors Andrew Gillespie and Katherine Ward for five years after Drinkwine repeatedly flipped them off, called them names, and surveilled them for over a year, in violation of a settlement agreement between the parties. Drinkwine challenges several of the trial court's findings of fact, contends his behavior was constitutionally protected speech, and argues the order is an overly broad prior restraint on his speech. Drinkwine's arguments lack merit; we therefore affirm.

## FACTS

Andrew Gillespie and Katherine Ward obtained a five-year anti-harassment protection order against their neighbor, Paul Drinkwine, after he yelled at them; called them, their child, and their relatives "trash," "bitch," and "property thieves;"

took videos of them; and flipped them off while walking or driving by their home and, on at least one occasion, while peering through a window of a family member's home.

Gillespie and Ward live in a Seattle townhome community with their two-year-old son. Drinkwine lives in the same complex. Drinkwine's townhome is located behind that of Gillespie and Ward and away from the main road. He is only able to access his property by a driveway easement running along and burdening the Gillespie/Ward property. There are approximately six townhomes behind Gillespie and Ward, and the residents of those homes use the same easement to enter and exit their properties. Drinkwine also owns a parking space in the complex located between his townhome and the main road.

Ward's sister and brother-in-law, Emily and Patrick Ascolese, own the other half of Gillespie and Ward's duplex. Their unit is adjacent to the easement and has windows looking out onto Drinkwine's parking space.

Drinkwine's animosity toward Gillespie and Ward arises out of a lawsuit he initiated against them and the Ascoleses in 2016 relating to the use of the shared easement. After prevailing on summary judgment against Drinkwine, Gillespie and Ward negotiated a settlement agreement with him in 2018. The agreement contained a mutually agreed-upon provision that the parties would "not communicate directly with each other except via certified mail or through willing parties (e.g., neighbors or attorneys)." Despite this agreement, Drinkwine began a "sustained and deliberate campaign" to harass Gillespie and Ward, their child, and their relatives.

2

Gillespie and Ward documented a number of incidents between May 2020 and January 2021 in which Drinkwine flipped them off while walking or driving by their property, yelled at their son and his babysitter, called members of the family "trash," video recorded them, made vulgar gestures at them through the Ascoleses' window, and flipped off their social guests.

According to Gillespie and Ward, Drinkwine "unilaterally declared the settlement to be dead" a few months after executing it and escalated his aggressive behavior toward them. His conduct led Gillespie and Ward to file a motion in King County Superior Court to enforce the 2018 settlement agreement. The court granted the motion in December 2020, confirming the agreement was legally binding on Drinkwine.

After losing in court, Drinkwine continued his pattern of insulting his neighbors when they were within earshot, looking into the windows of the Ascolese home while they and Gillespie and Ward were sitting as a family at their dining table and flipping them off, calling them "property thieves," and surveilling them. His conduct made Gillespie and Ward feel like they were trapped inside their own home.

In February 2021, Gillespie and Ward sought an anti-harassment protection order against Drinkwine. The trial court conducted a hearing and, after reviewing the parties' declarations and other submissions, found that Drinkwine had engaged in a course of conduct designed to alarm, annoy, and harass Gillespie and Ward's family. The court entered an anti-harassment protection order for a period of five years. The court also ordered Drinkwine to pay over $5,000 in attorney fees. Drinkwine appeals.

## ANALYSIS

## Sufficiency of Evidence of Unlawful Harassment

Drinkwine first challenges the sufficiency of the evidence supporting the trial court's determination that he engaged in a pattern of unlawful harassment under former RCW 10.14.020 and 10.14.080.[1] We reject his argument.

We review a court's decision to issue a protection order for abuse of discretion. RCW 10.14.080(6); *State v. Noah*, 103 Wn. App. 29, 43, 9 P.3d 858 (2000). When a court weighs contradictory evidence before the entry of a protection order, we review the court's findings for substantial evidence. *In re Marriage of Rideout*, 150 Wn.2d 337, 351, 77 P.3d 1174 (2003). Substantial evidence exists when, viewing it in the light most favorable to the prevailing party below, it is sufficient to persuade a rational person of the truth of the declared premise. *Boisen v. Burgess*, 87 Wn. App. 912, 918, 943 P.2d 682 (1997). We will not second guess a trial court's credibility determinations. *Wilson v. Wilson*, 165 Wn. App. 333, 340, 267 P.3d 485 (2011).

We review a trial court's conclusions of law de novo. *City of Seattle v. Megrey*, 93 Wn. App. 391, 393, 968 P.2d 900 (1998). Where a trial court's findings of fact provide a proper basis for entry of an anti-harassment order and substantial evidence supports the findings, this court will uphold the order on appeal. *Noah*, 103 Wn. App. at 39.

RCW 10.14.080(3) authorizes a court to enter an anti-harassment protection order upon finding by a preponderance of the evidence that unlawful

---

[1] This chapter was repealed, effective July 1, 2022, by LAWS OF 2021, ch. 215, § 170.

4

harassment exists. To establish "unlawful harassment," a petitioner must prove (1) a knowing and willful (2) course of conduct (3) directed at a specific person (4) which seriously alarms, annoys, harasses, or is detrimental to such person, and (5) which serves no legitimate or lawful purpose. RCW 10.14.020(2).

Drinkwine does not dispute that he engaged in a pattern of conduct over a long period of time that took the form of certain modes of communication directed toward Gillespie and Ward. He argues, however, that his course of conduct was constitutionally protected speech. Under the anti-harassment statute, a "course of conduct" is a "pattern of conduct composed of a series of acts over a period of time" and includes "any other form of communication, contact, or conduct . . . but does not include constitutionally protected free speech." RCW 10.14.020(1).

The trial court found that there had been a longstanding property dispute between the parties and that Drinkwine was unhappy with court decisions in that lawsuit. It further found that in 2018, the parties reached a settlement agreement in their pending litigation in which they agreed they would not contact each other directly, making Drinkwine aware that Gillespie and Ward wanted no further contact with him. It also found, however, that after signing this agreement, Drinkwine chose to create a hostile environment for Gillespie, Ward and their family by continuing to contact them for at least a year and doing so in a manner that could not be deemed constitutionally protected speech.

The record supports each of these findings and the findings support the court's legal conclusion that Drinkwine's speech is not protected. Drinkwine admitted he repeatedly flipped off Gillespie, Ward, and their toddler when he walked his dog and drove through the residential area. Gillespie and Ward testified

5

he engaged in hostile behavior by calling them names like "trash" and "property thieves" for over a year. Drinkwine testified he intentionally recorded himself talking to his dog, in which he called his neighbors "trash" when they were outdoors and within earshot. Gillespie and Ward further attested to the fact that Drinkwine repeatedly video recorded them and insulted them in the presence of children, aggressively shook his fists at Ward, and approached her and Gillespie when he saw them exit their home. Ward stated that on one occasion, when Drinkwine saw her exit the home with Gillespie, "he flipped us off emphatically even stepping in our direction, then seeing our concerned faces and withdrawn behavior, he appeared to take glee in making us uncomfortable and concerned." Gillespie and Ward presented the court with photos of Drinkwine flipping them off as he stood in the parking lot. On another occasion, he peered in through the Ascoleses' window, and flipped off three children, ages 6, 3 and 2. When Gillespie saw him through the window, Drinkwine smiled "in a sinister manner," and pumped his raised finger multiple times directly toward Gillespie's face.

Drinkwine contends his vulgar words and gestures directed toward his neighbors are constitutionally protected speech because he has the right to flip off and criticize his neighbors. We reject this argument. If the speech meets the definition of harassment, it is not protected speech. *State v. Alexander*, 76 Wn. App. 830, 837, 888 P.2d 175 (1995) (quoting *State v. Dyson,* 74 Wn. App. 237, 244, 872 P.2d 1115 (1994)). Even if we were to conclude that Drinkwine has a constitutional right to fling vulgar language and gestures toward his neighbors and their young child, judicial enforcement of a settlement agreement, between two private parties, in which the parties agreed to have no contact with each other, is

not "state action" and does not violate either the First Amendment or article I, section 5 of the Washington Constitution. *Noah,* 103 Wn. App. at 50. Drinkwine contractually waived his right to direct negative comments at his neighbors when he signed a settlement in which he explicitly agreed he would not do so.

The evidence also supports the finding that Drinkwine's actions were knowing and willful. He knew his communications were bothersome and unwanted—he signed a legally binding settlement agreement in which he agreed he would have no direct contact with Gillespie and Ward. And he does not challenge the trial court's findings that his harassment was specifically directed toward Gillespie and Ward. The record supports the findings that he did so.

Drinkwine does challenge the evidentiary support for the court's finding that he also directed his harassment at their 2-year-old child. The trial court, in its oral ruling, found that Drinkwine was "engaging hostilely with children." He argues that while the child may have been present when he engaged in offensive speech, he did not "engage" in a threatening manner with any children. But Gillespie and Ward testified that when neighbor Patrick Ascolese, Gillespie, and Gillespie's 2-year-old son were inside Gillespie's car, Drinkwine "stepped into view and made aggressive gestures towards [us], specifically including but not limited to flipping off all three of us." Gillespie provided the court with photographic evidence of Drinkwine's conduct. He also testified that on January 16, 2021, "Drinkwine flipped off [Ward] and [the child] (2 years old) while they were outside their home and [Drinkwine] was driving down the driveway." A similar incident occurred on December 24, 2020, while the Gillespie/Ward family and the Ascolese family were sharing Christmas Eve dinner. There were three minor children present at the time.

7

These types of interactions occurred repeatedly throughout 2020. On July 23, 2020, Drinkwine yelled at the 2-year-old and his 19-year-old babysitter while they were playing with a scooter in the driveway. During some of these encounters, the Ascoleses' two young children were also present. On several occasions, Drinkwine audibly insulted the family. Drinkwine made no attempt to shield any children from his hostile displays. From this evidence, the trial court was within its discretion to find Drinkwine was in fact engaging with children in a hostile manner, just as he was doing with the adults.

The record also supports the court's finding that Drinkwine's conduct seriously alarmed Gillespie and Ward and had a detrimental impact on them. Gillespie testified he felt he could not leave his house without receiving a verbal or non-verbal threat, he was frightened for his 2-year-old son's safety, and he was forced to be constantly on the "look out" when he leaves his home. Ward similarly testified that she feared "this very angry man" who appeared to be unable to control himself and feared he would "eventually snap and harm us physically." She too described herself as being constantly on high alert while at home. They testified that Drinkwine's actions made it difficult for them to maintain a comfortable and safe environment for their son.

Drinkwine challenges the trial court's oral finding that "there is a reasonable reason to fear for the well being of the child in this matter." Gillespie and Ward both testified that they were concerned for their son's well-being. Ward testified she worried that Drinkwine would snap and harm them physically, while Gillespie expressed worries about explaining Drinkwine's behavior to his young child. There

8

is sufficient evidence to support the trial court's finding that there is reason to fear for the child's well-being.

Finally, the record also supports the trial court's finding that Drinkwine's hostile behavior and words served no legitimate purpose. Under RCW 10.14.030, in determining whether a course of conduct serves any legitimate purpose, courts should consider whether

(1) Any current contact between the parties was initiated by the respondent only or was initiated by both parties;

(2) The respondent has been given clear notice that all further contact with the petitioner is unwanted;

(3) The respondent's course of conduct appears designed to alarm, annoy, or harass the petitioner;

(4) The respondent is acting pursuant to any statutory authority, including but not limited to acts which are reasonably necessary to:

(a) Protect property or liberty interests;
(b) Enforce the law; or
(c) Meet specific statutory duties or requirements;

(5) The respondent's course of conduct has the purpose or effect of unreasonably interfering with the petitioner's privacy or the purpose or effect of creating an intimidating, hostile, or offensive living environment for the petitioner;

(6) Contact by the respondent with the petitioner or the petitioner's family has been limited in any manner by any previous court order.

The trial court explicitly noted in its oral ruling that it had considered these statutory factors in rendering its ruling and determined that Drinkwine initiated the contact with Gillespie and Ward, that he was on clear notice that further contact was unwanted, and that the way in which he communicated with them was intended to alarm and harass them. It further found that Drinkwine was not acting to protect

9

any property or liberty rights; those rights had been adjudicated by the court and resolved via settlement agreement. The evidence supports these findings and also supports a finding that Drinkwine was intentionally creating an intimidating and hostile living environment for Gillespie and Ward, who were afraid to leave their home and were afraid for their child's safety.

Drinkwine relies on *State v. Brush*, 5 Wn. App. 2d 40, 425 P.3d 545 (2018) for the proposition that "the First Amendment generally protects verbal criticism of another person." But that case addressed whether RCW 9.94A.535(3)(h)(i), a criminal statute authorizing an exceptional sentence for engaging in an ongoing pattern of psychological abuse, was constitutionally overbroad under the First Amendment. *Brush*, 5 Wn. App. 2d at 49-50. We held the criminal statute did not violate the First Amendment because it did not limit a substantial amount of protected speech. *Id.* at 56-57. Drinkwine has not raised an overbreadth challenge to RCW 10.14.080 and the antiharassment statute does not criminalize speech. The purpose of chapter 10.14 RCW is "to provide victims with a speedy and inexpensive method of obtaining civil antiharassment protection orders preventing all further unwanted contact between the victim and the perpetrator." RCW 10.14.010. Reliance on case law addressing criminal convictions premised on speech is thus misplaced.

Moreover, Drinkwine's vulgar criticisms were solely directed toward private parties who were standing on their own property, walking down a public sidewalk, or eating dinner at their own dining room table. He was not criticizing a government agency or official or law enforcement officer. His actions were nothing more than a retaliatory response to his disappointment in losing a legal dispute with his

neighbors and his misperception that they were "property thieves."[2] Based on the record, the trial court did not err in concluding that Drinkwine had engaged in a knowing course of conduct designed to harass Gillespie, Ward and their child, and that conduct served no legitimate purpose. Because the evidence was sufficient for the court to find by a preponderance of the evidence that Drinkwine committed unlawful harassment, we affirm the trial court's findings and the legal conclusions it reached based on those findings.

Prior Restraint

Drinkwine next contends the anti-harassment order is overly broad, rising to the level of an unconstitutional prior restraint. This court reviews constitutional challenges de novo. *In re Marriage of Suggs*, 152 Wn.2d 74, 79, 93 P.3d 161 (2004). In *Marriage of Suggs*, a Kelso police officer sought an antiharassment order against Suggs, his ex-wife, after a lengthy and acrimonious dissolution proceeding. 152 Wn.2d at 77. He testified that Suggs had falsely informed various police agencies, emergency shelters, community legal service programs, and the editor of a local newspaper, that the officer was threatening and harassing her. *Id.* at 77-78. A trial court granted the requested antiharassment order, prohibiting Suggs from "making invalid and unsubstantiated allegations or complaints to third parties" to annoy, harass, vex or harm the law enforcement officer "for no lawful purpose." *Id.* at 78-79.

---

[2] We can find no basis for the argument that anyone has the right to peer into a neighbor's window for the purpose of "expressing criticism" of them. As our Supreme Court recognized in *Trummel v. Mitchell*, 156 Wn.2d 653, 667, 131 P.3d 305 (2006), there are "intense privacy values associated with the home in American law," and "the home is the principal exception to the general rule that the burden is on the viewer to avert his or her eyes from unwanted speech."

Suggs challenged the order as an unconstitutional prior restraint on free speech. 152 Wn.2d at 79. The court agreed, holding that the order was a prior restraint because it forbade speech before it occurred and the language of the order precluding the ex-wife from filing complaints with government agencies about potential harassment or abuse was unconstitutional "because it lacks the specificity demanded by the United States Supreme Court for prior restraint on unprotected speech." *Id.* at 84.

But in reaching this conclusion, it distinguished the order under its consideration from a standard antiharassment order affirmed by this Court in *Noah*, 103 Wn. App. at 41-42. *Suggs,* 152 Wn.2d at 82. In *Noah*, an individual who opposed a mental health counselor's therapy practices involving repressed memories, picketed outside the counselor's office, accusing him of engaging in "voodoo therapy" and spreading "child abuse hysteria." 103 Wn. App. at 34-35. Noah entered the therapist's office and spoke with his clients, made unsolicited phone calls to the therapist's home, and picketed in a way that discouraged the therapist's patients from entering his office. *Id.* at 35. The therapist also presented evidence that Noah had used cameras and video equipment to photograph him, his staff, and his clients. *Id.* The counselor obtained an antiharassment order precluding Noah from contacting him, from placing him under surveillance, from photographing or videotaping near the office building, and from being within 300 feet of the counselor's home or office. *Id.* Noah was cited for contempt for violating this order. *Id.* at 35-36.

Noah argued on appeal that an antiharassment order that prohibits having contact with another person and prohibits him from being in a particular 300-foot

12

zone around the person or their office was an unconstitutional prior restraint. 103 Wn. App. at 38-41. We rejected this argument, reasoning

> Protecting citizens from harassment is a compelling state interest. The legislature authorizes the court to order that the defendant have no contact with his intended victim. Determining no contact distances in an antiharassment order is a case by case determination. The statute is content neutral—no contact—whether profession of love, screams of hate or anything in between. The interest to be served is the safety, security, and peace of mind of the victim. It is narrowly tailored by focus on the victim and a no contact zone around the victim. It leaves open ample alternative channels of communications, by leaving open every alternative channel so long as no contact is made with the victim and in proscribed zone is not violated. The antiharassment order authorized by the statute is an appropriate time, place, and manner restriction [and] does not constitute an unconstitutional prior restraint.

103 Wn. App. at 41-42. We further held that even though Noah's picketing outside the therapist's office was protected speech, the court had the power to prohibit "all activity and attempts to communicate within the designated no contact zone" and the order was not "void per se because it proscribe[d] what would otherwise be constitutionally protected conduct." *Id.* at 42.

In *Suggs*, our Supreme Court noted this reasoning with approval and found it distinguishable from an order precluding an ex-wife from reporting allegations of abuse and harassment to government agencies and support service providers. 152 Wn.2d at 82. We conclude this case is more analogous to *Noah* than *Suggs*.

The antiharassment order here narrowly restrained only unconsented contact, surveillance, and direct communication with Gillespie, Ward, and their minor child;

> **No Contact:** Respondent is restrained from making any attempts to contact Petitioners and [their minor child].
> **Surveillance:** Respondent is restrained from making any attempts to keep under surveillance Petitioners and [their minor

13

child]. Respondent is permitted to maintain home security cameras for purposes of home security.

**Other:** There shall be no communication by Respondent with Petitioners and their minor child. Any and all communication between parties shall be conducted through the parties' respective counsel as outlined in the parties' settlement agreement under King County Cause No. 16-2-24646-0 SEA.

The court did not impose any "no contact zone" restriction because of their proximity as neighbors. When counsel sought clarification whether Drinkwine could flip off his neighbors while sitting in his car with the windows up, the court clearly said, "[h]e is not to have contact with the petitioners."

We conclude the order is not an unconstitutional prior restraint. First, the order prohibits contact and does not prohibit Drinkwine from seeking legal redress in the courts or through government agencies. Second, it enforces the settlement agreement Drinkwine previously signed by prohibiting communications with Gillespie and Ward while simultaneously allowing him the legally permissible, alternative channel of communicating via counsel. He is free to express criticism of Gillespie and Ward but he must do so in the manner authorized by the trial court. The order is thus an appropriate time, place and manner restriction on Drinkwine's free speech rights.

Overbreadth

Drinkwine next argues that the order is also unconstitutionally overbroad because it is not narrowly tailored to the facts of this case and "is incredibly long in duration." We review de novo a trial court's interpretation of constitutional provisions. *State v. Bradford*, 175 Wn. App. 912, 922, 308 P.3d 736 (2013).

RCW 10.14.080(6) gives courts broad discretion to grant any relief the court deems proper. The facts of the relationship between the parties guides the court's

14

discretion. *Trummel v. Mitchell*, 156 Wn.2d 653, 668, 131 P.3d 305 (2006). The court must tailor the order as precisely as possible to the needs of the case. *Suggs*, 152 Wn.2d at 83 (quoting *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 183, 89 S. Ct. 347, 21 L. Ed. 2d 325 (1958). RCW 10.14.080(4) provides that an antiharassment order may not exceed one year in duration "unless the court finds that the respondent is likely to resume unlawful harassment of the petitioner when the order expires." If such a finding is made, the court may order a fixed time exceeding one year or "may enter a permanent antiharassment protection order." *Id*. The court made this necessary factual finding. It stated in its oral ruling that it deemed a five-year time frame appropriate "given the length of time [in] which [the] parties have been involved with these disputes, starting back in, I believe it was, 2016 with the initial litigation and continuing on."

It is unclear whether Drinkwine is challenging the constitutionality of RCW 10.14.080(6) as overly broad under the First Amendment or raising only a challenge to the order itself. He does not, however, provide any authority for the proposition that the duration of a protection order may be unconstitutionally overbroad, even if the statute authorizing an order of that length is not, and the terms of the order are not.

If Drinkwine is challenging RCW 10.14.080(6), we presume that statute is constitutional. *State v. Immelt*, 173 Wn.2d 1, 6, 267 P.3d 305 (2011). A law is overbroad if it sweeps within its prohibitions constitutionally protected speech activities. *City of Seattle v. Huff*, 111 Wn.2d 923, 925, 767 P.2d 572 (1989). In *Bradford*, this court rejected an overbreadth challenge to the state's stalking

15

statute, which incorporated by reference the definition of "course of conduct" from the antiharassment statute, RCW 10.14.020(1). We held that by excepting from the statute's reach any constitutionally protected free speech activity, the legislature made it clear that protected speech is not regulated by the statute. 175 Wn. App. at 925. As in *Bradford*, the antiharassment statute does not intrude on any constitutionally protected activity and is thus not overly broad.

If Drinkwine's challenge is solely to the duration of this permissible order restricting his contact with his neighbors, we see no abuse of discretion in extending it for five years given the duration of the parties' legal disputes and Drinkwine's proven willingness to violate a settlement agreement he signed, even after Gillespie and Ward obtained a court order affirming its validity. The record supports a finding that Gillespie, Ward, and Drinkwine have been involved in litigation since 2016. Even though they resolved their original property dispute by settlement in 2018 and Drinkwine contractually agreed not to directly communicate with Gillespie and Ward, he began aggressively and hostilely engaging with the family in 2020 and continued this behavior for more than a year. The court had ample basis for believing Drinkwine would resume harassing his neighbors once the order expired and that a one-year protection order would be insufficient. We therefore reject Drinkwine's overbreadth challenge.

### Attorney Fee Award

Finally, Drinkwine contends that the trial court erred in awarding attorney fees to Gillespie and Ward. We review de novo whether there is a legal basis for an award of attorney fees. *In re Vulnerable Adult Pet. for Winter*, 12 Wn. App. 2d 815, 836, 460 P.3d 667, *review denied,* 196 Wn.2d 1025, 476 P.3d 565 (2020)

16

(citing *Gander v. Yeager*, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012)). In Washington, attorney fees are recoverable when "'authorized by statute, a recognized ground of equity, or agreement of the parties.'" *Winter*, 12 Wn. App. 2d at 836 (quoting *Niccum v. Enquist*, 175 Wn.2d 441, 446, 286 P.3d 966 (2012)). Under RCW 10.14.090(2), the court may require the respondent in an anti-harassment action to reimburse the petitioner for their incurred costs, including reasonable attorney fees. There was thus a statutory basis for the attorney fee award.

Affirmed.

Andrus, C.J.

WE CONCUR:

Birk, J.

Mann, J.